**In re Charles J. WEISS, Debtor.**

**United States of America, Plaintiff,**

v.

**Charles J. Weiss, Defendant.**

**Bankruptcy No. 97–31204DAS.**
**Adversary No. 99–0312DAS.**

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Aug. 17, 1999.

James Nelson Clymer, Lancaster, PA, former counsel for debtor.

Paul B. Maschmeyer, Ciardi, Maschmeyer & Karalis, PC, Philadelphia, PA, present counsel for debtor.

Christopher R. Zaetta, U.S. Department of Justice, Washington, DC, for Internal Revenue Service.

Arthur P. Liebersohn, Philadelphia, PA, trustee.

Frederic Baker, West Philadelphia, PA, Ass't. U.S. Trustee.

### OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

#### A. INTRODUCTION

The instant proceeding ("the Proceeding"), initiated by the UNITED STATES OF AMERICA on behalf of its agency the Internal Revenue Service ("the IRS") against CHARLES J. WEISS ("the Debtor"), presents our first opportunity to apply the principles established for interpretation of 11 U.S.C. § 523(a)(1)(C), relating to the dischargeability of federal income tax liabilities, in *In re Fegeley,* 118 F.3d 979 (3d Cir.1997). Specifically, the question before us is whether the Debtor's failure to file tax returns for six years, 1986 through 1991, while he earned substantial income and made substantial non-tax expenditures during that period, constitutes sufficient grounds to support a finding of willful evasion of taxes in light of the Debtor's partial but significantly underestimated annual tax payments and series of claimed hardships during this period, namely missing records for 1986 and 1987, a hostile divorce, and an extraordinarily complex and expensive home building project.

Since the Debtor's conduct is clearly sufficient to justify nondischargeability of all of the taxes in question, the issue is whether the Debtor was able to convince us that his various hardships and distractions were sufficient to establish the lack of a voluntary intention on his part not to pay the IRS. We find these hardships and distractions sufficient only as to tax years 1986 and 1987, but not thereafter. As a result, only the liabilities for tax years 1986 and 1987 will be discharged. Per a stipulation between the parties and our reluctance to liquidate nondischargeable obligations generally, *see e.g., In re Brady,* 234 B.R. 652, 663 (Bankr.E.D.Pa.1999), and cases cited cases cited therein, will not assign a dollar figure to the Debtor's remaining tax liability.

#### B. PROCEDURAL AND FACTUAL HISTORY

The Debtor filed his first bankruptcy case, Bankr. No. 94–15488DAS, under Chapter 13 of the Bankruptcy Code on August 22, 1994. That case was voluntarily dismissed on January 10, 1995. On September 15, 1997, the Debtor filed the instant underlying case, under Chapter 7 of the Code. He received a discharge of all of his "dischargeable debts" in this case on April 16, 1998, and it was closed on April 23, 1998. We note that, prior to his discharge, on February 2, 1998, the Debtor filed a proceeding, Adversary No. 98–0062, against the IRS to determine the validity, priority and extent of its lien(s). However, this proceeding was voluntarily dismissed on April 9, 1998.

On January 11, 1999, the IRS filed a motion to reopen ("the Motion") the Debt-

or's case in order that it could pursue the Proceeding and obtain a determination of the dischargeability of the Debtor's liabilities to it. In our experience, it is quite unusual for the IRS to take the initiative in bringing such matters before this court. The hearing on the Motion, originally scheduled on February 11, 1999, was continued until March 16, 1999, and then again until March 23, 1999, when it was granted without opposition. In granting the Motion, we directed the IRS to file the intended proceeding concerning the dischargeability of the Debtor's tax debts to the IRS by April 9, 1999, and we tentatively fixed a trial for June 8, 1999.

After the IRS filed its complaint on April 12, 1999, it successfully moved to extend the filing date. In the order granting this motion, the trial of the Proceeding was rescheduled on a must-be-tried basis on June 30, 1999, at which time it was in fact conducted.

The only witness to testify at trial was the Debtor. He related that he has been continuously employed as an attorney the law firm of Timoney, Knox, Hasson & Weand ("the Firm") since 1973, and has been quite successful, appearing before this court as an advocate in several cases. It was revealed that the Debtor's income during the period 1986 to 1991 ranged from approximately $140,000 to slightly over $220,000 annually. The Debtor testified that, although he knew of his duty to file tax returns and had indeed filed timely returns every year through 1985, he failed to do so in 1986 and for several years thereafter.

The Debtor attributed his failure to file to several occurrences in his life. In 1986 he separated from his first wife. In both 1986 and again in 1987 he learned that his first wife, whose mental and physical health apparently deteriorated and whose hostility towards the Debtor increased as time went on, had maliciously taken all of his records needed for the compilation of his tax returns. These records were recovered sometime after the Debtor's first wife died from cancer in 1989. Her death also marked the end of an increasingly hostile divorce proceeding between her and the Debtor.

The Debtor nevertheless continued in his failure to file returns for the next four years. As an explanation, the Debtor claimed that, at that point, it was "hard to catch up." The Defendant further explained that the house he and his girlfriend, who became his second and present wife, had contracted in 1986 to have built for approximately $300,000 became a "nightmare" due to numerous instances of incompetent workmanship by the original general contractor. The Debtor testified that this building project, over which he and his second wife ultimately assumed the role of general contractors, consumed substantial amounts of their time, energy, and money to the tune of at least an additional $300,000 and possibly as much as $700,000 over a period of the next ten years, and still is not fully completed.

The Debtor further testified, however, that he believed he was current or nearly so with his tax obligations at all times even though he failed to file returns for six years. That is because, in each of these years, the Debtor remitted an estimated payment which he believed was equal to his tax liability with a request for a filing extension. However, in each instance, he failed to file his tax return in the allotted extension time. He testified that he did not discover that he had underestimated his tax liabilities for all of these years until September 1994, the week after his first bankruptcy filing, when, with the help of an accountant, he finally filed returns for the years 1986 through 1991.

In fact, the Defendant had underestimated his tax liability during this period by a total of over $110,000. When asked how he could have so significantly underestimated his now-acknowledged tax liabilities, the Debtor stated that he based his estimates on his properly-filed 1985 return. The Debtor now attributes the discrepan-

cies to 1986 changes to the Tax Code and his failure to include the "self-employment tax" in his calculations. Also, it appears that the returns through 1985 were prepared jointly with his first wife, and were filed individually thereafter, which greatly affected his liabilities. It is undisputed that, despite his failure to file, the Debtor never faced criminal charges for his actions.

The IRS, in its cross-examination, brought out that the Debtor had made several rather substantial non-tax expenditures during the 1986 to 1991 period. Specifically, the Debtor made two loans to his first wife, totaling $4,190, in 1987 and 1988, and another in 1988 to a friend in the amount of $12,500 to start a business. Although he owned a 1982 BMW automobile and his then girlfriend and eventual second wife had possession of a company vehicle from her employment of which the couple made use on trips, the Debtor also bought what he "thought" was a new Peugeot automobile for over $18,000 in 1988. In 1990 or 1991 this vehicle was traded for a Volvo. Also, in 1990 the Debtor spent "between $10,000 and $20,000" on his wedding to his second wife and in addition spent $6,000 on their honeymoon in Nova Scotia. Finally, he continued to invest "nominally" in the stock market.

The IRS also focused upon the Debtor's 1994 transfer of the title of the land upon which the home was built, purchased in 1986 under joint tenancy with a right of survivorship with his former girlfriend, to a tenancy by the entireties with his now-wife. The Debtor testified this was done at the request of a title insurance company as a prerequisite to acquiring refinancing for the home. He denied the assertion made by the IRS that this was a calculated maneuver to remove the home from the reach of an IRS tax lien.

By our order of June 30, 1999, we set a schedule requiring the IRS to file its post-trial brief by July 23, 1999, and the Debtor to file his brief by August 6, 1999. Both parties acknowledged that the decision in

*Fegeley* was controlling, although each, as might be expected, argued that it supported their positions that the debts were nondischargeable or dischargeable, respectively, for all of the six tax years at issue.

## C. DISCUSSION

A debtor under Chapter 7 of the Code receives, with certain exceptions, a discharge of all debts, including income tax debts, for which a return is due more than three years after the bankruptcy filing. *See* 11 U.S.C. §§ 523(a)(1)(A), 523(a)(1)(B), 507(a)(8)(A). The most important exception relating to income tax debts, as are at issue here, is 11 U.S.C. § 523(a)(1)(C), which provides as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(1) for a tax or a customs duty—

(C) with respect to which the debtor made a fraudulent return or *willfully attempted in any manner to evade or defeat such tax* (emphasis added).

Because this section provides two separate grounds upon which a tax liability may be found nondischargeable, it is to be read in the disjunctive. *See In re Nguyen,* 1998 WL 433902, at *7 (Bankr.E.D.Pa. July 30, 1998), *aff'd in relevant part,* 1999 WL 553468 (E.D.Pa. July 21, 1999). We are concerned here with the second alternative, known as the willfulness exception. This exception to discharge, like all others, is to be strictly construed in favor of the debtor, and the IRS has the burden to prove its case by a preponderance of the evidence. *See Fegeley, supra,* 118 F.3d at 983. It has been established that the IRS can satisfy this burden by demonstrating that the Debtor, more likely than not, willfully attempted to evade his taxes. *See Berkery v. Commissioner,* 192 B.R. 835, 840 (E.D.Pa.1996), *aff'd,* 111 F.3d 125 (3d Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 208, 139 L.Ed.2d 144 (1997).

The willfulness exception under § 523(a)(1)(C) consists of a conduct ele-

ment (an attempt to evade or defeat taxes) and a *mens rea* requirement (willfulness). *See In re Tudisco,* 183 F.3d 133, 136 (2d Cir.1999); and *Fegeley, supra,* 118 F.3d at 983. In *Fegeley, supra,* the court held that the debtor's tax debts were nondischargeable due to his failure to file tax returns or to pay any taxes owed for three tax years when he had sufficient funds available to make such payments. 118 F.3d at 981. The bankruptcy court had found, and the Third Circuit agreed, that Fegeley " 'probably had enough money to pay th[e] taxes[,] . . . spent too much[,.] . . . was much too lavish[, and] . . . didn't make good judg[ ]ments about the allocation of his resources.' " *Id.* at 982.

■ However, it reversed the bankruptcy court's decision that the debts nevertheless were dischargeable because, although the IRS had proven the debtor's knowing failure to file tax returns and make payments when he had sufficient resources to do so, these factors were insufficient to establish the requisite "attempt to evade or defeat his tax liability." *Id.* The *Fegeley* court held that the IRS was entitled to prevail because it satisfied each element of the following three-part test:

(1) [the] debtor had a duty to file income tax returns;

(2) [the] debtor knew he had such a duty, and

(3) [the] debtor voluntarily and intentionally violated that duty.

*In re Semo,* 188 B.R. 359, 362 (Bankr. W.D.Pa.1995); *see also [In re ] Bruner,* 55 F.3d [195,] at 197 [ (5th Cir.1995) ].

*See also In re Birkenstock,* 87 F.3d 947, 952 (7th Cir.1996); *Dalton v. Internal Revenue Service,* 77 F.3d 1297, 1300–01 (10th Cir.1996); and *Toti v. United States,* 24 F.3d 806, 808–09 (6th Cir.), *cert. denied,* 513 U.S. 987, 115 S.Ct. 482, 130 L.Ed.2d 395 (1994).

■ The Debtor relies on two authorities in support of his defense, *In re Haas,* 48 F.3d 1153 (11th Cir.1995); and *Snyder*

*v. United States of America,* 1997 WL 375719 (Bankr.M.D.Fla. April 14, 1997), a case applying *Haas. Haas* decided "[t]he sole question at issue . . . whether a debtor's failure to pay his taxes, without more," constitutes a violation of the willfulness exception of § 523(a)(1)(C), 48 F.3d at 1155, favorably to the debtor. In so doing, the *Haas* court invokes the "criminal willfulness" standard of 26 U.S.C. § 7201. However, no other Circuit has adopted this "kinder, gentler" standard of determining willfulness, and it is clearly not adopted in the *Fegeley* decision which we must follow, which instead applies the broader civil willfulness standard. *See Tudisco, supra,* 183 F.3d at 136–137 (noting the different standards and refusing to make a choice between them).

In any event, it would appear that the Debtor's reliance on these cases is misplaced. *Haas* is distinguishable because the debtor there *had* filed all of his tax returns. Also, the IRS recognizes its need to prove more than just the Debtor's failure to pay taxes. It has to meet the three-pronged *Fegeley* test.

*Snyder* is more analogous because the debtor there did not file tax returns. In fact, Snyder, like the Debtor as to tax years 1986 and 1987, was unable to obtain tax records due to actions of a hostile former wife, 1997 WL 375719, at *1. However, Snyder's personal and financial situation continued to worsen during the entire period in issue, while the Debtor's stabilized considerably after 1986 and 1987. At all times, the Debtor has enjoyed a productive and stable career as an attorney at the Firm, while Snyder bounced around through long periods of unemployment in which he exhausted all of his savings. *See id.* at *1–*2. Also, Snyder's second wife suffered severe injuries which were not covered by insurance, *id.* at *2, while no such tragedy befell the Debtor. Finally, Snyder also entered a payment program with the IRS and "was diligent with his payments." *Id.*

Applying the *Fegeley* test, we can easily conclude that the first two prongs are satisfied. The Debtor had a duty to file tax returns and, as an attorney, was well aware of this duty. Since he failed to file his returns for any of the six years at issue, these two "conduct elements" were clearly satisfied. We find, however, that the third, *mens rea* element requires us to carefully analyze all of the facts asserted by the Debtor which tend to mitigate the voluntary and intentional aspects of his failure to perform his duties as to each of the tax years in question.

With respect to the Defendant's failure to file tax returns and consequently his failure to pay a substantial portion of his taxes due for tax years 1986 and 1987, we find the Debtor has sufficiently demonstrated that he did not intentionally and voluntarily fail to file these returns or make the entire requisite payments. There was unrebutted testimony offered by the Debtor that his records for those years were unavailable, making his failure to file problematic and therefore not sufficiently intentional and involuntary. The IRS bore the burden to prove those elements, and we find that, for these years, it failed to do so. We therefore hold the Debtor's 1986 and 1987 tax liabilities to be dischargeable.

However, by 1988 the Debtor had access to his records and by 1989 the turmoil created by his first wife ceased with her death. The Debtor's main defense regarding his failure to file his tax returns after 1987 was the continuing innumerable problems arising from the construction of his new home which began in 1988. While we accept the Debtor's testimony that these problems were significant, we do not believe they warranted the Debtor's continuing and hence exacerbated failure to fail to file tax returns year after year.

There is also ample evidence that the Debtor would have had sufficient income to satisfy his tax liabilities if his returns had been filed properly. However, the Debtor continued to allocate considerable monies to a building project which seems to have been doomed from the start, demonstrating a lack of sound financial judgment. Furthermore, he spent considerable sums on expensive motor vehicles, made substantial loans, invested in the stock market, and spent a significant sum on a wedding and honeymoon with a woman with whom he had previously lived for several years. As the years went by, the Debtor's excuses for failing to have his returns filed in the proper manner wore thin. Even if the Debtor was indeed unable to find the time to complete his returns, he clearly had the resources to hire an accountant to do so well before six years had passed without filing. By comparison, Fegeley had only failed to file tax returns for three years and his tax liabilities were excepted from discharge.

While we recognize that the Debtor actually made what he considered full payments on his tax obligations, no effort was undertaken to ensure that these obligations were in fact satisfied until 1992 or possibly even 1993. The actual returns were not filed until September 1994. While these returns went unfiled, the Debtor, as mentioned above, spent substantial sums on items which most taxpayers would consider to be luxuries. Even after learning of his large tax debt, the Defendant failed to make any payments in an effort to cure his arrears with the IRS. At least as to the tax years after 1987, it can clearly be said that "[t]his is a case where the debtor chose to pay other creditors and, in lieu of payments on taxes, purchased a valuable home and numerous luxury items." *In re Angel*, 1994 WL 69516, at *4 (Bankr.W.D.Okla. Feb. 24, 1994).

These actions on the part of the Debtor, when taken as a whole, establish a sufficient basis upon which to find that he attempted to evade or defeat his tax liabilities after 1987. We do note that we do not find sufficient evidence that the Debtor transferred the realty on which he built his home from a joint tenancy to a tenancy by

the entireties as an attempt to protect his assets from attachment by the IRS. Thus, we decline the invitation of the IRS to support a finding of voluntary and intentional evasion of tax liability on the basis of this act.

We therefore reach what is essentially a compromise decision. We hold that the Debtor's tax liabilities for tax years 1988 through 1991 are excepted from discharge but grant the Debtor a discharge from his tax liabilities for tax years 1986 and 1987.

## D. CONCLUSION

An order consistent with this decision shall be entered.