**In re William SCARPIELLO, Debtor.**

**William Scarpiello, Plaintiff,**

**v.**

**United States of America, Defendant.**

**Bankruptcy No. 98–32463SR.
Adversary No. 98–796.**

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Oct. 20, 1999.

Daniel K. Astin, Office of U.S. Trustee, Philadelphia, PA.

John R. Crayton, Crayton & Belknap, Bensalem, PA, for debtor.

Thomas M. Rath, Mellon Independence Center, Philadelphia, PA.

Michael Kaliner, Jackson, Cook, Caracappa & Bloom, Fairless Hills, PA, trustee.

## OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

In the matter presently before the Court debtor William Scarpiello (the "Debtor") seeks a determination of the dischargeability of a debt for federal income taxes owed to the United States of America (the "Government") pursuant to § 523(a)(1)(C) of the United States Bankruptcy Code (the "Code"), 11 U.S.C. §§ 101–1330. After the conclusion of a trial held May 10, 1999, the Court took the matter under advisement and provided the parties an opportunity to file legal memoranda in lieu of closing arguments. After belated receipt of the Government's submission the matter is ripe for decision. For the reasons discussed below, the Court finds the debt in the amount of $15,507 for 1994 income taxes nondischargeable pursuant to Code § 523(a)(1)(C). Judgement, therefore, will be entered for the Government and against the Debtor.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over the parties and subject matter of this core proceeding pursuant to 28 U.S.C. § 1334, § 157(a), § 157(b)(1) and (b)(2)(A), (I) and (O).

## BACKGROUND

The Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on September 30, 1998. The Debtor's single largest creditor is the Internal Revenue Service ("IRS"). It is conceded that as of the petition date, the Debtor owed $15,507 for taxes on unreported income received in 1994.[1] On November 20, 1998 the Chapter 7 Trustee filed a report of no assets in the case. On November 23, 1998, the Debtor commenced the instant adversary proceeding seeking a determination of the dischargeability of the aforesaid tax debt.[2]

Although the income tax liability at issue here is derived from several sources of unreported 1994 income, the bulk of the liability arises from certain distributions the Debtor received from a profit sharing or pension plan he participated in at Sobar–Avery, a former employer.[3] As part of a 1994 divorce settlement his former spouse agreed to release any claim she might have to the monies held in the subject Plan. The Debtor thus became the sole beneficiary. The Debtor estimated the Plan to have been worth approximately $33,000 to $34,000 at or about that time. He testified that other than the Plan, he left his marriage with practically nothing. Consequently, he requested a distribution of the balance held in the Plan to help establish a new life for himself. He testi-fied that he received a check in the net amount of only about $17,000. He further testified that company officials at Avery–Dennison, the successor entity of Sobar–Avery, told him at the time that all taxes and penalties relating to the early withdrawal of the pension monies had been withheld from the amount distributed to him.

When asked what the monies distributed to him had been used for the Debtor responded that after the divorce he was essentially starting over for himself from "ground zero." He then identified three main areas of expense to which the funds were applied. First, he testified that he used approximately $4,000 to pay off a car loan that was three months in arrears. Second, he testified that because of the credit history he shared with his former spouse he had to deposit six months advance rent in order to lease a one bedroom apartment. Third, he testified that, because he left his marriage with virtually nothing, he had to acquire furnishings for the apartment. He added that most of what he purchased were second hand furnishings. In response to questions concerning the disposition of the items he bought with the Plan money the Debtor testified that in September or October 1994 he remarried and moved into the furnished house owned by his wife, Diane

---

1. At trial the Government stipulated that an accuracy related penalty that was also assessed against the Debtor for the 1994 tax year in the amount of $1,504 is dischargeable under Code § 523(a)(7)(B) because it relates to an event that occurred more than three years before the filing date of the petition.

2. As originally filed the Debtor's complaint sought a determination of the validity, priority, and/or dischargeability of a debt for federal income taxes pursuant to Code § 506, § 507(a)(8)(A) and § 523(a)(1)(C). Several of the issues framed in the complaint, however, appear to have been resolved prior to the start of trial. First, the Court notes that in its answer to the complaint the Government admitted that the Debtor's personal income tax liability for 1994 is not entitled to priority under Code § 507(a)(8)(A). Moreover, as dis-cussed in the preceding footnote, the Government stipulated that an accuracy related penalty assessed against the Debtor for the 1994 tax year in the amount of $1,504 is dischargeable under Code § 523(a)(7)(B). Finally, the Court notes that at the start of trial Debtor's counsel conceded that a federal tax lien filed by the IRS will remain in place to the extent that it attached to property of the Debtor. It appears therefore, that the only issue to be determined at trial is whether or not the debt for 1994 federal income taxes is nondischargeable under Code § 523(a)(1)(C).

3. The Debtor testified that he was employed by Sobar Avery from 1972 to 1993. He testified that after Avery merged with Dennison Manufacturing and became known as Avery–Dennison, he lost his job due to "corporate downsizing."

Scarpiello. He testified that since he no longer needed the furnishings he had purchased for his apartment he gave most of the items, including a television set, to his sons. He reiterated that most of the things he bought after the divorce were second hand, the implication, it seems, being that such items were not likely to be of much value. He testified that he might have kept some small items such as dishes and plastic ware.

The Debtor timely filed his 1994 federal income tax return. He testified that his tax return that year, as in past years, was prepared by a third party "like an H & R Block type place." The only income reported on the 1994 tax return are wages in the amount of $25,950 as stated on an attached form W–2 from employer North Wales Press, Inc. The Debtor claimed three exemptions—one for himself, and one each for two minor children. Based on the information reported on the tax return the Debtor had a federal income tax obligation in the amount of $2,224, against which his employer withheld $1,823. According to his return, the Debtor underpaid his income taxes for 1994 and owed the Government an additional $401.

At trial the Government introduced Exhibit G–1, a "Notice of Deficiency" dated April 4, 1997, for tax year ending December 31, 1994 (the "Notice"). It is not disputed that the address of the Debtor printed on the Notice—215 Neshaminy Road, Croyden, PA—was the Debtor's correct mailing address in April 1997. The first page of the Notice stated that a tax deficiency in the amount of $15,507 was owed for 1994. The deficiency amount derived from two main sources: a) unreported income; and b) disallowed exemptions. The third page of the Exhibit provides the details. Included on this page is the income from North Wales Press, which

the Debtor did report on his tax return. However, the Notice also details income from four unreported sources. As noted previously, the largest component of the unreported income consisted of the distributions the Debtor received from the Plan. According to the Notice the Debtor received two such distributions. One of these was a distribution in the amount of $33,738 from Fidelity Investments, from which taxes in the amount of $6,747 were withheld. The other distribution, in the amount of $2,106, was from the Bank of America. Taxes in the amount of $421 were withheld from this distribution. Also included on this page of the Notice is income from Dennison Manufacturing Company in the amount of $7,327, from which federal income tax in the amount of $817 was withheld. Lastly, the Debtor failed to report interest income in the amount of $9 paid by Commonwealth Savings Bank, from which no taxes were withheld. The foregoing information concerning income paid to the Debtor in 1994 was reported to the IRS by the entities making the payments. The second component of the tax deficiency resulted from the disallowance of two of the three exemptions the Debtor claimed on the 1994 tax return.[4] Exhibits D–1, G–1, at p. 6, and G–7. The disallowance of these two exemptions resulted in the Debtor's taxable income for 1994 being increased by $4,900.

The Debtor maintained that he did not remember receiving the Notice, or seeing it before trial. He admitted, however, that the address listed for him on the first page thereof was his correct mailing address in 1997. In his post-trial memorandum the Debtor does not attempt to overcome the presumption that the 1997 Notice, mailed to the correct address, was received. *Hagner v. United States*, 285 U.S. 427, 430, 52 S.Ct. 417, 419, 76 L.Ed. 861 (1932);

---

**4.** Government witness Gloria Pitts, an employee of the IRS Special Procedures Branch specializing in bankruptcy matters, testified that certain handwritten notations appearing on the Debtor's 1994 tax return, Exhibit D–1, next to the box pertaining to exemptions indi-

cate that upon review by the IRS the two exemptions the Debtor claimed for his minor children were disallowed. No explanation for the disallowance of the exemptions is provided in the notations on the tax return, nor was Pitts aware of the basis for this action.

*In re Bodnar,* No. 98–MC–95, 1998 WL 480856 (E.D.Pa. August 13, 1998). The Debtor moreover admitted receiving an earlier notification from the IRS, in late 1995 or early 1996, which apparently informed him that additional taxes were due as a result of the distributions from the Plan. This admission appears to be consistent with information contained in the Notice which indicates that correspondence was previously mailed to the Debtor on or about October 25, 1996. *See* Exhibit G–1, at p. 2.

The Debtor did not dispute the amount of the assessed tax deficiency either at trial or before (*e.g.,* by formally responding to the Notice). At trial, however, the Debtor did attempt to explain some of the information contained in the Notice. First, he explained that he did not report the distributions from the Plan on his income tax return because he thought, based on what company officials allegedly told him when the distributions were made, that all taxes and/or any penalties for early withdrawal had already been withheld. As to the income reported to the IRS by Dennison Manufacturing in 1994, the Debtor, although he did not dispute receipt of the monies, simply responded that he was not employed by Dennison in 1994. No explanation or comment was offered pertaining to the interest income reported by Commonwealth Savings Bank. The Debtor, likewise, did not offer any explanation for the disallowance of the two exemptions, claimed on his 1994 tax return. Debtor's counsel, however, elicited the admission of Government witness Gloria Pitts that she had no specific knowledge as to whether or not the Debtor was entitled to the exemptions he claimed, and that it was possible the IRS could have mistakenly disallowed the exemptions. The Debtor, notwithstanding, offered no evidence to indicate that the disallowance of the exemptions was in error.

On or about March 27, 1998, the IRS filed tax liens against the Debtor. Exhibit G–7. On September 14, 1998 the IRS lev-ied on $784 in a joint banking account of the Debtor and his wife. *Id.* The Debtor admitted that after the IRS levy he and his wife quickly closed the joint account and opened a new account at First Union Bank in his wife's name only. The Debtor admitted that all of his current income from Brenner Tool & Die, Inc. is deposited into the new account, and that his wife, in whose name the account stands, was at the time of trial disabled and unemployed. The Debtor explained that he did this in order to pay household bills, and also because some of the money the IRS had levied on had belonged to his wife, who was not indebted to the IRS for 1994 taxes. His wife, he added, has been successful in getting the IRS to return to her the money it had seized from the original account.

Pitts, identified Exhibit G–7 as a transcript of activity relative to the Debtor's 1994 federal income tax return. She testified that numerous payments reflected on the transcript, generally in the amount of $66 each, were applied against the Debtor's 1994 tax liability. She added, however, that these payments were eventually reversed and reapplied to the joint tax liability of both the Debtor and his spouse for 1995. A review of the transcript reveals that all of the reversed payments were made in either 1996 or 1997. Reviewing Exhibit G–8 (transcript of the Debtor's and spouse's 1995 joint tax return) Pitts testified that reapplication of these payments to the 1995 tax year eliminated the tax liability for that year. The notations reflected on the transcript relating to the reversals of the subsequent payments state "correct subsequent pymt processed in error to form 1040 tax period Dec. 1995."

## DISCUSSION

█ It has long been held that one of the primary purposes of the Bankruptcy Code is to provide a means by which those struggling under the weight of oppressive indebtedness can "reorder their affairs,

make peace with their creditors, and enjoy a 'new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (*quoting Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)). The bankruptcy discharge is the embodiment of this "fresh start" principle, and lies at the very heart of the Bankruptcy Code. *See* Code § 727(b) and § 524(a). These remedial aims are not without limitation, however, as certain acts or conduct of the debtor can lead to the forfeiture, either in whole or in part, of the opportunity afforded by the Code to be discharged from one's debts. *See e.g.,* 11 U.S.C. § 523(a) and § 727(a).

At issue in the instant case is Code § 523(a)(1)(C) which provides, in pertinent part, that:

(a) A discharge under section 727, . . . of this title does not discharge an individual debtor from any debt—

(1) for a tax or a customs duty—

(C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax;

Code § 523(a)(1)(C) is comprised of two disjunctive provisions. *In re Weiss,* 237 B.R. 600, 604 (Bankr.E.D.Pa.1999). In the instant case the Government does not contend that the Debtor "made a fraudulent return" under the first provision of this section. Rather, the Government argues that the debt owed by the Debtor is nondischargeable under the second prong of the section, to wit, that the Debtor "willfully attempted . . . to evade or defeat such tax" by failing to report certain income on his 1994 federal income tax return.

■■■ The burden of proof in this matter is on the Government even though the action was commenced by the Debtor. *In re Irvine,* 163 B.R. 983, 985 (Bankr. E.D.Pa.1994). The Government must prove by a preponderance of evidence that the Debtor willfully attempted to evade or defeat his tax liability. *Grogan v. Garner,* 498 U.S. at 291, 111 S.Ct. 654. As with all Code § 523(a) exceptions to discharge, the provisions of Code § 523(a)(1)(C) are to be strictly construed in favor of the Debtor. *See In re Cohn,* 54 F.3d 1108, 1113 (3d Cir.1995). Also, as noted in *Weiss, supra,* it has been established that the IRS can satisfy its burden by demonstrating that the Debtor, more likely than not, willfully attempted to evade his taxes. See *Berkery v. Commissioner,* 192 B.R. 835, 840 (E.D.Pa.1996), *aff'd* 111 F.3d 125 (3d Cir.) *cert denied,* 522 U.S. 81, 118 S.Ct. 208, 139 L.Ed.2d 144 (1997).

The leading case in this Circuit construing the second prong of Code § 523(a)(1)(C) is *In re Fegeley,* 118 F.3d 979 (3d Cir.1997). In *Fegeley* the Court of Appeals for the Third Circuit identified both a conduct requirement (that the debtor sought "in any manner to evade or defeat" his tax liability) and a mental state requirement (that the debtor did so "willfully") under the plain language of the statute. *Id.,* at 983. Looking at the conduct requirement the Third Circuit observed that " 'Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation.' " *Id.* quoting *Dalton v. I.R.S.,* 77 F.3d 1297, 1301 (10th Cir.1996) (quoting *Spies v. United States,* 317 U.S. 492, 499, 63 S.Ct. 364, 87 L.Ed. 418 (1943)). Moreover, use of the phrase "in any manner" in this provision indicates that a broad range of conduct falls within the purview of the statute. *Id.* The Third Circuit stated that while a debtor's failure to pay taxes alone would not satisfy this requirement, nonpayment of taxes would nonetheless be relevant evidence that should be considered in the totality of conduct to determine whether or not the debtor willfully attempted to evade or defeat taxes. *Id.* Applying this standard to the facts of the case then before it the Third Circuit deter-

mined that Fegeley's intentional failure to file tax returns, together with his failure to pay taxes when he had the resources to do so, was sufficient to prove that he attempted to defeat his tax liabilities for the tax year at issue. *Id.,* at 984.

In considering the mental state requirement the Third Circuit adopted the test for "civil willfulness." *Fegeley,* 118 F.3d at 984. This test requires the Government to prove that the Debtor's attempt to avoid tax liability was "voluntary, conscious, and intentional." *Id.* Willfulness in this context is consistent with the definition found in other civil tax cases. *See In re Toti,* 24 F.3d 806, 809 (6th Cir.), *certiorari denied,* 513 U.S. 987, 115 S.Ct. 482, 130 L.Ed.2d 395 (1994). In order to prevail the government need establish only that the debtor: (1) had a duty to file income tax returns; (2) knew he had such duty; and (3) voluntarily and intentionally violated that duty. *Fegeley,* 118 F.3d at 984. In the instant case since the Debtor timely filed a tax return for the time period in question, but failed to include on such tax return certain income, to prevail on this aspect of its claim the Government must establish that the Debtor: (1) had a duty to report the income in question on his tax returns; (2) knew of the duty; and (3) voluntarily and intentionally violated that duty. *Id., see also Matter of Birkenstock,* 87 F.3d 947, 952 (7th Cir.1996) (stating the test this way: the debtor must both (1) know that he has a tax duty under the law, and (2) voluntarily and intentionally attempt to violate that duty).

Applying the above standard in the instant case the Court finds that both elements of the second prong of Code § 523(a)(1)(C) have been met. First, the Court notes that while the determinations of the Debtor's income and tax deficiency contained in the Notice are entitled to a presumption of correctness, *See Bohnet v. C.I.R.,* T.C.Memo 1999–238, 1999 WL

729183 (U.S. Tax Court, July 22, 1999), the Debtor himself made no attempt to dispute either of these determinations during this proceeding. The Court finds therefore that the Debtor admittedly received income from the five sources listed in the Notice, but only reported information relating to one source, North Wales Press, on his tax return. The Court also infers, since the Debtor does not contend that his tax preparer intentionally or inadvertently left any of the unreported sources of income off the return, that the Debtor did not provide information to the preparer relating to these sources of income, *e.g.,* forms W–2,1099–R and 1099–INT, and thus intended not to report the income in question on his tax return.[5] The Court also notes the existence of the large discrepancy between the net amount the Debtor testified he received as a result of distributions from the Plan, $17,000, and the *actual* amounts distributed to him as disclosed to the IRS by Fidelity Investments, $26,991, and the Bank of America, $1,685. The large unexplained difference of $11,856, would have significantly reduced the Debtor's liability for the taxes at issue herein. The Court finds that because the Debtor intentionally failed to report the income in question on his tax return in 1994, and failed to pay any of the taxes due on such income, despite having resources available to him at the time that were sufficient to pay all or a substantial portion of this liability, the Debtor attempted to evade or defeat his liability for such taxes, thus satisfying the conduct requirement under Code § 523(a)(1)(C) as described in *Fegeley.*

As noted above, in order to prevail on the mental state requirement of the statute the Government must prove that the Debtor: (1) had a duty to report the additional income on his tax return; (2) knew of the duty; and (3) voluntarily and intentionally violated that duty. As to the

---

5. The majority of Courts have found that affirmative conduct by a debtor designed to evade or defeat a tax is not required. Rather,

§ 523(a)(1)(c) encompasses acts of culpable omission as well as acts of commission. *Fegeley,* 118 F.3d at 983.

first of these requirements, there is no question but that the Debtor had a duty to report each of the unreported sources of income on his tax return. As to the second element, the Debtor's tax returns for 1994 through 1997, Exhibits D–1, and G–4, G–5 and G–6, indicate knowledge on his part of a requirement under the federal tax code that taxpayers must report income, particularly wage income, on their tax returns. The Debtor's failure to report wage income from Dennison Manufacturing alone, thus clearly satisfies the second mental state requirement. The Court notes also however the Debtor's failure to even acknowledge $11,856 in Plan distributions made to him, and the puzzling matter of the disallowance of the exemptions claimed by the Debtor for his minor children. These facts seriously undermined the Debtor's credibility on a key point. Specifically, the Court does not believe the Debtor's testimony that he thought he did not have to report the Plan distributions on his tax return, because he believed that all taxes had been withheld at the time of distribution. This explanation rings hollow in the face of the Debtor's adamant misstatement of the cash he actually received from the Plan. It is inconsistent, moreover, with a prior demonstrated awareness by the Debtor that although taxes are withheld from earnings throughout the year, *gross* earnings must nevertheless be reported on a tax return come April 15th. Finally, since the Debtor utilized a paid tax preparer to prepare his 1994 tax return, he had a resource readily available to him to whom basic questions concerning distributions from the plan could have been posed. The Debtor apparently posed no questions and offered no information. This strongly suggests that the Debtor knew of his duty to report the income, but thought he could evade it by remaining silent. *See Irvine*, 163 B.R. at 987 (since direct proof of a debtor's willful attempt to evade taxes may be difficult to establish, "circumstantial evidence and reasonable inferences" drawn therefrom

may be used to establish the Debtor's willfulness.)

The third element of the *mens rea* requirement does not require a showing of evil motive or sinister purpose. *Irvine*, 163 B.R. at 986. Rather, it suffices if the conduct is merely voluntary and intentional. The Debtor's conduct met this standard. As noted above, the Debtor failed entirely to report on his tax return distributions from the Plan totaling $35,844, income in the amount of $7,327 from his former employer, and interest income in the amount of $9 from Commonwealth Savings Bank. The Debtor correspondingly spent $11,856, paid to him, that could have been used to reduce the substantial tax liability he now faces. The record demonstrates these to have been voluntary, intentional acts. There is no persuasive evidence to the contrary. The foregoing actions provide a sufficient basis upon which to find that the Debtor willfully attempted to evade or defeat his tax liability. *In re Weiss*, 237 B.R. at 606.

In reaching the conclusion that the mental state requirement has been met here the Court also considered, but did not place great weight, on the fact that the Debtor and his spouse opened a new checking account after the IRS levied on their joint account. The Court found credible the Debtor's testimony that this was done solely to pay regular household expenses. Also, the Court considers the reapplication of tax payments from the Debtor's individual 1994 tax liability to eliminate the 1995 liability owed jointly with his present wife to be of neutral effect. On this point the Court notes that the description provided on the transcript of the Debtor's 1994 tax liability states that the reversal and reapplication of payments was to correct an erroneous original application of the payments. The failure to contest the assessment for additional taxes is also a neutral event given the Debtor's apparent concession to the assessed amounts. Finally, the Court considers the Debtor's failure to report $9 in

interest paid by Commonwealth Bank to be of diminimis import.

Although Debtor's counsel artfully presented his case in the best light possible for the Debtor, the Court finds that the evidentiary balance clearly tips in favor of the Government. Thus, the Government has met its burden of proof. Accordingly, the $15,507 tax debt is declared nondischargeable pursuant to Code § 523(a)(1)(C). Judgment shall be entered in favor of the Government and against the Debtor on the instant complaint. An Order consistent with the findings and conclusions made herein shall be entered.