In re Roberto S. ELEAZAR, Debtor.

United States of America, Plaintiff,

v.

Roberto S. Eleazar, Defendant.

Bankruptcy No. 97–21682 (DHS).
Adversary No. 99–3992.

United States Bankruptcy Court,
D. New Jersey.

Dec. 12, 2001.

Charles M. Flesch, Trial Attorney, Tax Division, U.S. Department of Justice, Washington, D.C., for Plaintiff.

Jeffrey A. Cooper, Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, Roseland, NJ, for Defendant.

## OPINION

DONALD H. STECKROTH,
Bankruptcy Judge.

This matter is before the court upon a motion for summary judgment brought by the United States of America ("United States" or "Plaintiff") in its adversary proceeding against the debtor, Roberto S. Eleazar ("Eleazar" or "debtor"). The United States seeks a determination that the debtor's income tax liabilities are non-dischargeable pursuant to 11 U.S.C. § 523(a)(1)(C) and that the debtor's counterclaim should be dismissed. The debtor opposes the motion. For the reasons that follow, the motion for summary judgment is granted in part.

The court has jurisdiction under 28 U.S.C. §§ 1334(b), 151, and 157(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Venue is proper under 28 U.S.C. § 1409(a). The following shall constitute the court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

### I. PROCEDURAL HISTORY

The debtor, Dr. Roberto S. Eleazar, filed a petition under Chapter 11 of title 11, United States Code (the "Bankruptcy Code") on February 13, 1997. The bankruptcy filing was prompted by the collection efforts of the Internal Revenue Service ("IRS"). The IRS had commenced an administrative action against the debtor to collect his past due income taxes for the tax years 1980—1983 and 1986—1992. The IRS is the debtor's largest creditor, having filed a proof of claim in the amount of $4,003,204.87, consisting primarily of a secured claim of $3,975,480.02 representing debtor's tax liabilities for tax years 1980—1983 and 1986—1992.

On October 15, 1999, the United States filed an adversary complaint seeking to have this court determine that the debtor's assessed income tax liabilities for tax years 1980 through 1983 and 1986 through 1992 are not dischargeable under 11 U.S.C. § 523(a)(1)(C).

The debtor's answer to the adversary complaint contained a general denial and asserts a two-count counterclaim in which he seeks (1) a determination that the assessed penalties incurred pre-petition are dischargeable pursuant to 11 U.S.C. § 523(a)(7)(A) and (B); and (2) an accounting providing the manner in which payments have been applied by the IRS.

Depositions were taken by the parties and the discovery phase is now closed. The motion for summary judgment was brought by the United States and opposed by the debtor. Thereafter, the court heard oral argument.

### II. FINDINGS OF FACT

Dr. Eleazar was born in the Philippines and received a medical degree before coming to the United States. Eleazar is currently a New Jersey licensed anesthesiologist and has worked in that capacity at Valley Hospital in Ridgewood, New Jersey since 1970. In the late 1960s, he was a medical resident at Kings County Hospital in Brooklyn, New York. In that capacity, Eleazar was treated as an employee for income tax purposes. Federal and state income taxes were deducted from his paycheck, and he received Federal W–2 Forms reporting what his wages were for each year. Eleazar knew he was required to file a federal income tax return the April following each tax year. He was also aware that if he did not have enough taxes withheld from his paycheck, he had to pay income taxes. When he went to work for Valley Hospital in 1970, he was employed by a group of anesthesiologists and was again treated as an employee for tax purposes.

In June 1963, Eleazar married Anne Peden ("Mrs. Eleazar").[1] The Eleazars had four children: Jessica Lynne Eleazar (now married and known as Jessica Wedge), who was born in 1964; Jennifer Eleazar (now married and known as Jennifer Eleazar Callan), who was born in 1966; Jonathon Roberto Eleazar, who was born in 1968;[2] and Jeremy John Eleazar, who was born in 1969. Eleazar also has several grandchildren, the first being Madeline K. Eleazar who was born to Jennifer in 1990.

During the entire marriage, Mrs. Eleazar was a housewife and earned no income outside the home. Eleazar regularly gave his wife money to pay for household expenses and to make mortgage payments. In June of 1972, the Eleazars purchased a home at 4 Manchester Court in Ramsey, New Jersey for the sum of $87,900 ("Manchester Court Property"). The property was purchased with a $60,000 mortgage. The property included a four-bedroom house on a half acre of land and became the marital home where the Eleazars raised their four children. With the funds Eleazar gave to his wife on a monthly basis, Mrs. Eleazar would pay the mortgage, property taxes, water charges, landscaping service, and homeowner's insurance costs.

Eleazar incorporated in 1973 as a professional service association ("PA") in 1973 to conduct his medical practice. He used his home as his business address. In 1978, Eleazar stopped operating as a PA when the IRS levied on the PA's bank accounts because of Eleazar's failure to file corporate employment Form 941. Additionally, Eleazar's corporate charter was revoked in 1976 for failure to file the required forms.

The debtor's problems with the IRS commenced in the 1970s when he failed to pay his income taxes. For the years 1970—1972 and 1974—1977, Eleazar did not file a federal Form 1040 income tax return. In a letter to the IRS dated August 25, 1975, Eleazar's explanation for the failure to file returns was that he was a procrastinator, had incomplete records, was embarrassed over his disorganization, and had stopped seeking the advice of an accountant.[3]

It was not until 1979 that the United States first commenced civil proceedings against Eleazar and his business for his failure to pay taxes. This began an over-twenty-year battle with the IRS that has lasted to the present. Despite the IRS proceedings, Eleazar continued to ignore his legal obligation to pay income taxes. He failed to file tax returns for years 1978, 1979, 1980, 1981, 1982, and 1983, despite having substantial income for each of those periods. Through review of financial records by revenue agents, the IRS was able to determine Eleazar's income and tax liabilities for the years 1978—1983:

1. At the time this motion was filed, the Eleazars were married, but separated. After the court heard argument in this matter, it was advised Mrs. Eleazar passed away.

2. Jonathon Eleazar was killed in an automobile accident in 1992.

3. Aside from these problems, Eleazar harbored some controversial views of the government's taxing authority. Eleazar became familiar with the rhetoric of Irwin Schiff, a convicted tax felon, who contended that the dollar was worthless because it was not backed by gold and that it was difficult to determine how much any individual citizen was required to pay in taxes. *See Schiff v. United States,* 919 F.2d 830, 833 (2nd Cir. 1990), *cert. denied,* 501 U.S. 1238, 111 S.Ct. 2871, 115 L.Ed.2d 1037 (1991)(detailing Schiff's refusal to pay income taxes). In addition to considering Schiff's views, Eleazar voiced his personal opposition to the United States' involvement in the Philippines as a rationale to his family members for his failure to pay income taxes.

| Year | Gross Income | Tax Due |
|------|-------------|---------|
| 1978 | $137,154 | $46,920 |
| 1979 | 120,043 | 38,539 |
| 1980 | 118,498 | 38,049 |
| 1981 | 118,800 | 38,547 |
| 1982 | 222,391 | 82,356 |
| 1983 | 204,280 | 66,679 |

In addition to the debtor's failure to file returns and pay income taxes, he continuously undertook to transfer assets to his wife and children. On July 15, 1981, Mrs. Eleazar issued a personal check to the IRS for $16,230 to obtain a release of an IRS levy on the Manchester Court property. Thereafter, by deed dated January 1, 1983, Eleazar and his wife transferred the family home to the "Roberto Eleazar Trust, Matthew Peden Trustee."[4] The conveyance was for a recited consideration of $100, but there was no physical transfer of money. After this transfer, the Eleazars continued to reside in the residence and continued to make regular mortgage payments and pay associated expenses. Matthew Peden, the trustee of the Roberto S. Eleazar trust, is Eleazar's brother-in-law. Eleazar intended that Peden would not have any duties as trustee unless both Eleazar and his wife perished, then Peden would become guardian of the Eleazar children. No bank accounts were ever opened for the trust, the trust never obtained a tax identification number, and no lease was signed between the trust and Eleazar and his wife. The only circumstance which changed as a result of the January 1, 1983 transfer was a change in the title of the Manchester Court Property. This transfer of the Manchester Court Property took place after the property had been released from the previous IRS lien and during the time Eleazar and his wife were under further IRS audit for tax years 1974—1977 for having failed to file income tax returns.

Since the early 1980's, the debtor has financially supported his children even after they left home. Eleazar paid for his two daughters to attend expensive, private colleges and bought them both cars when they graduated. While his eldest daughter, Jessica, was attending college in Massachusetts, Eleazar purchased a time share condominium ("the Massachusetts Condo") and placed title to the property in Jessica's name, although she was unaware that her father placed the Manchester Condo in her name.

Once his two daughters graduated college, Eleazar began a series of real estate purchases in which he bought properties for his children—a New York City apartment to be used for rental income; a house in Ridgewood, New Jersey ("156 North Walnut Street Property"); a second house in Ridgewood ("220 Oak Street Property") which was purchased for use by his unmarried daughter and her newborn child; a home in Ramsey, New Jersey ("the Davidson Avenue Property") for use by Eleazar's two sons. Eleazar bought the properties and contributed additional monies in various ways to his children during the same years he was failing to file returns and pay taxes.[5]

---

4. The deed states that "Grantors make a gift of the equity in their home to a Trust established for the benefit of their children." However, neither Eleazar nor his wife filed a Federal Gift Tax return regarding the transfer.

5. Aside from his cash contributions for the down payments on several properties, Eleazar routinely gave money to his children so that they could make the mortgage payments on the various properties. Additionally, Eleazar spent $25,000 in 1992 on a wedding reception for his daughter Jessica and from May 1994 through September 1995, Eleazar gave Jennifer $4,000 per month so that she and her newborn daughter could be supported. From September 1994 through May 1995, Eleazar also paid for Jennifer's tuition in a pre-medical program at Columbia University in New York City. In May 1997, after he filed for Chapter 11 relief, Eleazar transferred title in

Eleazar was buying real estate and providing four children with a comfortable lifestyle while at the same time he continued to neglect his tax obligations to the federal government. By purchasing the properties and providing other financial support to his children, Eleazar systematically transferred his assets to them or for their benefit.

In addition to the many transfers, Eleazar gave his wife money each month so that she could make mortgage payments and pay other bills. With remaining funds, Mrs. Eleazar opened bank accounts in her name and in the names of her children. By 1990 or 1991, Eleazar was giving $10,000 per month to Mrs. Eleazar. In April 1993, Eleazar gave his wife $23,922.06 for a down payment on a property in Bailey Island, Maine ("the Maine Property"). Title in the Maine Property was placed solely in Mrs. Eleazar's name, even though the debtor provided all the funds necessary to purchase the property.

Between 1993 and 1996, with the monthly payments Eleazar gave her, Mrs. Eleazar continued to make cash gifts to her emancipated children and minor grandchildren. By 1993, Mrs. Eleazar had accumulated over $400,000 from the monthly transfers.

In 1987, Eleazar reached agreement with the IRS on assessment for income taxes and penalties as reflected in IRS Form 870 for tax years 1978 to 1983.[6] On April 29, 1988, the government issued the assessments for those years. The total of tax, interest and penalties for years 1978 through 1983 was $706,308.34.

In May 1989, the IRS filed a notice of federal tax lien with the Bergen County Clerk's Office regarding Eleazar's past due income taxes for 1978—1983. On May 5, 1989, the IRS issued notice of levies to third parties to collect for Eleazar's 1978—1983 income taxes. This action apparently prompted Eleazar to forward small amounts of money to the IRS. After more third-party notices were filed in 1990, larger payments were made which were applied to Eleazar's 1978 tax liabilities. In February 1987, Eleazar paid off his tax liabilities for 1977, 1984 and 1985 with the use of a home equity loan he obtained against the Manchester Court Property. However, as of February 13, 1997, Eleazar's income tax liabilities for the years 1980 through 1983 remained unpaid.

On August 21, 1990, Eleazar was served with several IRS administrative summonses. In connection with the assessed income tax liabilities for 1978—1983, the IRS sought financial information concerning Eleazar's assets, including a copy of the Roberto Eleazar trust agreement. The IRS also sought records seeking to determine his income for 1986 through 1989 since Eleazar had again failed to file personal income tax returns. When he failed to comply with the IRS summonses, the United States filed a civil suit in the United States District Court for the District of New Jersey to enforce the summonses. A Consent Decree enforcing the summonses was entered which required Eleazar to provide the IRS with a copy of the trust agreement and to file tax returns for 1986 through 1990. Eleazar failed to file his 1986—1990 income tax returns. He maintained he felt "overwhelmed" by the amount of paper work that was required. Eleazar eventually sought legal assistance. The issuance of a January 31, 1992 Order by the District Court prompt-

the Davidson Avenue Property to his son Jeremy without court or creditor knowledge or approval.

6. Previously, Eleazar agreed to an IRS assessment for tax years 1974 through 1977.

ed Eleazar to file income tax returns for the years 1986 through 1990. Although Eleazar reported taxes due of over $100,000 for each of those tax years, he made no payments whatsoever when he filed the returns.

Based on Eleazar's returns as filed, the IRS made income tax, interest and penalty assessments against Eleazar as follows:

| Tax Year | Assessed Amount |
|---|---|
| 1986 | $ 341,325.10 |
| 1987 | 488,274.75 |
| 1988 | 267,750.18 |
| 1989 | 240,633.14 |
| 1990 | 213,637.04 |
| TOTAL = | $1,551,121.21 |

In July and August 1992, the IRS filed notices of federal tax liens with respect to Eleazar's 1986 through 1993 income tax liabilities. On April 23, 1993, Eleazar filed his 1991 and 1992 tax returns with the IRS but failed to pay the income tax liabilities which he reported on these returns. Eleazar reported an adjusted gross income of $438,217 and $463,808 for each of these years, respectively. On June 7, 1993, assessments were made against Eleazar for years 1991 and 1992. The total assessment for these two years came to $370,658.11.

Starting with tax year 1993 and continuing through 1998, Eleazar filed his federal income tax returns with the IRS, and began making estimated tax payments for each of those years. Between October 24, 1994 and December 14, 1996, Eleazar made three written offers to the IRS to compromise his past due income tax liabilities for tax years 1978—1983 and 1986—1992. The IRS rejected all of Eleazar's offers of settlement.

On February 11, 1997, the IRS issued levies to third parties seeking to collect Eleazar's past due taxes. On February 13, 1997, Eleazar filed a petition for relief under Chapter 11 of the Bankruptcy Code.

After the filing of the instant adversary proceeding by the United States, Mrs. Eleazar was served with a subpoena to give testimony and produce documents. On May 8, 2000, Mrs. Eleazar filed a Divorce action in the New Jersey Superior Court.

The IRS entered into a cash collateral agreement with the debtor on April 2, 1997. Said agreement required the debtor to make post-petition payments of $10,000 per month to the IRS towards the IRS's secured claim encompassing Eleazar's income tax liabilities for years 1980—1983 and 1986—1992. Eleazar's income tax liabilities for tax year 1980 have been fully satisfied through these post-petition payments.

### III. CONCLUSIONS OF LAW

The primary issue presented to the court is whether 11 U.S.C. § 523(a)(1)(C) excepts from discharge the income taxes and interest assessed against the debtor for 1981—1983 and 1986—1992. The United States argues that the taxes should be excepted from discharge because the debtor failed to pay taxes for the subject years (and others) even though he knew he was under an obligation to do so. The government also points to a multitude of willful acts of omission and commission by the debtor which demonstrate, they contend, that the liabilities for these years are nondischargeable. All of these actions taken together, the United States asserts, constitute willful tax evasion under section 523(a)(1)(C) of the Bankruptcy Code. In opposition, the debtor argues that this matter is not ripe for summary judgment as there are genuine issues of material fact concerning whether the debtor's failure to timely file and pay his income taxes for the subject tax years was the result of willful or evasive conduct. The debtor urges the court to deny summary judgment and al-

low the adversary proceeding to continue to trial.

## A. *The Summary Judgment Standard*

Summary judgment is justified if the moving party can "show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P.* 56(c). When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court must accept the non-movant's version of the facts as true, and resolve conflicts in the non-movant's favor. *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992). However, by its very terms, Rule 56(c) provides that the mere existence of *some* alleged factual disputes will not defeat a properly supported motion for summary judgment. Only disputes over facts which might affect the outcome of the suit will preclude entry of summary judgment. Partial disputes that are irrelevant or unnecessary are not counted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The initial burden of demonstrating the absence of genuine issues of material fact falls on the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has done so, the burden shifts to the non-movant. The non-movant "cannot merely rely upon conclusory allegations in his pleadings or in memoranda and briefs to establish a genuine issue of material fact." Instead, he "must make a showing sufficient to establish the existence of every element essential to his case, based [upon] the affidavits or by the depositions and admissions on file." *Harter v. GAF Corp.*, 967 F.2d 846, 852 (3d Cir.1992). Rule 56(e) does not allow a party resisting a summary judgment motion to rely merely upon "bare assertions, conclusory allegations or suspicions." *Reitmeier v. Kalinoski*, 631 F.Supp. 565, 567 (D.N.J.1986) (citing *Jersey Central Power and Light Co. v. Lacey Township*, 772 F.2d 1103 (3rd Cir.1985)).

The debtor argues that the record before the court is insufficient to decide the issue presented on a motion for summary judgment. He argues that the court needs to conduct a trial and analyze the credibility of witnesses in order to determine whether he willfully evaded his payment of income taxes under 11 U.S.C. § 523(a)(1)(C). The court is not persuaded by this argument. This case is appropriate for decision on a motion for summary judgment. *See In re Meyers*, 196 F.3d 622, 627 (6th Cir.1999)(Sixth Circuit affirming grant of summary judgment in favor of IRS under § 523(a)(1)(C)); *In re Wilbert*, 262 B.R. 571, 578 (Bankr.N.D.Ga.2001)(summary judgment granted in favor of IRS); *In re Carnes*, 244 B.R. 435, 448 (Bankr.W.D.Mo.2000)(summary judgment granted to IRS); and *In re Jones*, 116 B.R. 810, 816 (Bankr.D.Kan.1990)(summary judgment in favor of IRS).

## B. *Analysis under Section 523(a)(1)(C)*

The discharging of debts in bankruptcy serves the purpose of providing the debtor a "fresh start." Those struggling under the weight of overwhelming indebtedness can "reorder their affairs, make peace with their creditors, and enjoy a 'new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.' " *Grogan v. Garner*, 498 U.S. 279, 286–87,

111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)). These remedial aims are not without limitation, however, as certain acts or conduct of the debtor can lead to the forfeiture, either in whole or in part, of the opportunity afforded by the Code to be discharged from one's debts. *See e.g.,* 11 U.S.C. § 523(a) and § 727(a). At issue here is Bankruptcy Code section 523(a)(1)(C), which excepts from discharge any debt –

(1) for a tax or a customs duty –

(C) with respect to which the debtor made a fraudulent return or *willfully attempted in any manner to evade or defeat such tax.*

11 U.S.C. § 523(a)(1)(C) (emphasis added). Under § 523(a)(1)(C), tax debts are non-dischargeable if the debtor either filed a fraudulent return or willfully attempted to evade or defeat the payment of taxes. Section 523(a)(1)(C) is thus comprised of two disjunctive provisions. *In re Weiss,* 237 B.R. 600, 604 (Bankr.E.D.Pa.1999), rev'd in part, 2000 WL 1708802 (E.D.Pa. November 15, 2000). In the matter before the court, the sole issue is whether the IRS has presented sufficient evidence, for purposes of summary judgment, that Dr. Eleazar "willfully attempted in any manner to evade or defeat" his federal income tax liabilities.

 It is clear that the United States bears the burden of proving by a preponderance of the evidence that a debtor's tax liabilities are excepted from discharge under § 523(a)(1)(C). *United States v. Fegeley (In re Fegeley),* 118 F.3d 979, 983 (3rd Cir.1997). *Accord United States v. Fretz (In re Fretz),* 244 F.3d 1323, 1327 (11th Cir.2001); *Spirito v. United States (In re Spirito),* 198 B.R. 624, 628 (Bankr.M.D.Fla.1996)(Under a preponderance of the evidence standard, "the ques-

tion presented in this case is whether it is more likely than not that the [debtors] willfully attempted, in any manner, to evade or defeat the tax liabilities they seek to have declared discharged.")(citing *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)). As with other Code § 523(a) exceptions to discharge, the provisions of § 523(a)(1)(C) are to be strictly construed in favor of the debtor. *See In re Cohn,* 54 F.3d 1108, 1113 (3d Cir.1995).

 *In re Fegeley,* 118 F.3d 979 (3d Cir.1997) is the leading case in this Circuit construing willful evasion for purposes of § 523(a)(1)(C). In *Fegeley,* the Court of Appeals identified both a conduct requirement (that the debtor sought "in any manner to evade or defeat" his tax liability) and a mental state requirement (that the debtor did so "willfully") under the plain language of the statute. *Id.* at 983. With respect to the conduct requirement, the Third Circuit observed that " 'Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation.' " *Id. quoting Dalton v. I.R.S.,* 77 F.3d 1297, 1301 (10th Cir.1996) (*quoting Spies v. United States,* 317 U.S. 492, 499, 63 S.Ct. 364, 87 L.Ed. 418 (1943)). Affirmative conduct by the taxpayer to evade or defeat a tax is not required, "[r]ather, 523(a)(1)(C) encompasses acts of culpable omission as well as acts of commission." *Fegeley,* 118 F.3d at 983–84. Courts look to the totality of circumstances in evaluating whether the taxpayer's conduct "willfully attempted to evade or defeat taxes" *Id.* at 983.

 Congressional use of the phrase "in any manner" in this provision indicates that a broad range of conduct was intended to fall within the purview of the statute. *Id.* While it is acknowledged that a debt-

or's failure to pay taxes alone would not satisfy the conduct requirement, nonpayment of taxes is nonetheless relevant evidence that should be considered in the totality of conduct to determine whether or not the debtor willfully attempted to evade or defeat taxes. *Id.; In re Birkenstock,* 87 F.3d 947, 951 (7th Cir.1996)(Just as nonpayment of tax alone will not justify nondischargeability, an inability to pay debts in subsequent years is not a defense to previous intentional attempts to evade or conceal one's tax liabilities.) Applying this standard to the facts of the case before it, the Court in *Fegeley* determined that the debtor's intentional failure to file tax returns, together with his failure to pay taxes when he had the resources to do so, was sufficient to prove that he attempted to defeat his tax liabilities for the tax year at issue. *Id.* at 984.

■ Moreover, an attempt to conceal, transfer, or otherwise assign assets in an effort to put them beyond the reach of the IRS for tax collection purposes is a "manner" of "attempt[ing]...to evade or defeat such tax," within the plain meaning of section 523(a)(1)(C). *Dalton v. IRS (In re Dalton),* 77 F.3d 1297, 1303 (10th Cir. 1996); *Griffith v. United States (In re Griffith),* 206 F.3d 1389, 1396–97 (11th Cir. 2000), *cert. denied,* 531 U.S. 826, 121 S.Ct. 73, 148 L.Ed.2d 37 (2000)(intra-family transfer of property for little or no consideration constituted conduct covered by section 523(a)(1)(C)); *United States v. Sternberg (In re Sternberg),* 229 B.R. 238, 245 (S.D.Fla.1998) (placing assets out of reach of the IRS through fraudulent conveyances to family members constituted a willful attempt to evade payment of tax liabilities under section 523(a)(1)(C)).

■ With respect to the mental state requirement, the Third Circuit adopted the test for "civil willfulness." *Fegeley,* 118 F.3d at 984. This test requires the Government to prove that the debtor's attempt to avoid tax liability was "voluntary, conscious, and intentional." *Id.* Willfulness in this context is consistent with the definition found in other civil tax cases. *See In re Toti,* 24 F.3d 806, 809 (6th Cir.), *cert. denied,* 513 U.S. 987, 115 S.Ct. 482, 130 L.Ed.2d 395 (1994). In order to prevail, the Government need establish only that the debtor: (1) had a duty to file income tax returns; (2) knew he had such duty; and (3) voluntarily and intentionally violated that duty. *Fegeley,* 118 F.3d at 984. *See also Matter of Birkenstock, supra,* 87 F.3d at 952 (the debtor must both—know that he has a tax duty under the law, and voluntarily and intentionally attempt to violate that duty). It is not, however, necessary to demonstrate that the debtor had an evil motive or bad purpose in not paying his taxes in order to determine whether the debtor acted willfully. *Wright v. IRS (In re Wright),* 191 B.R. 291, 292 (S.D.N.Y.1995) *accord Langlois v. United States,* 155 B.R. 818, 821 (N.D.N.Y.1993)("debtor's bad purpose or evil motive in failing to collect and pay taxes properly play no part in the civil definition of willfulness ... If the intended result of a taxpayer's action is that the United States would not receive the income taxes, then he has acted willfully...")

■ Applying the above standards to the facts in the instant case, it is evident that both elements of the second prong of Code § 523(a)(1)(C) have been met. Beginning in the 1960s, the debtor, a highly educated professional, was aware of his obligation to file federal income tax returns, yet he habitually failed and refused to file returns from the 1970s into the 1990s. Despite having substantial income during each of those years, Eleazar refused to pay taxes. His conduct permitted Eleazar and his family to accumulate

wealth and assets with funds which otherwise could have satisfied his tax obligations. As is detailed above, hundreds of thousands of dollars were transferred to or for the benefit of his wife and four children over a period of years while he was willfully refusing to honor his tax obligations.

Eleazar clearly knew that his property and other assets would be subject to federal tax liens as a result of his failure to pay taxes. He therefore willfully took steps to systematically transfer his assets in order to avoid such liens and IRS collection efforts. No other rational explanation for his conduct can fairly be read into his actions. For example, in 1983, the Eleazars transferred title to the family home to a trust, for no consideration, which had the effect of insulating the home from the IRS. This transfer was made at a time when Eleazar was fully aware of his liability for past due taxes and, in view of the totality of the circumstances, his motive for such action could not be more evident. The purchase of other properties for family members with funds which could have been used to pay taxes are further proof of debtor's willful attempt to evade taxes.

While Eleazar argues that he fully cooperated with the IRS and even began filing returns, the facts show he did so only after specific and direct collection action was taken against him by the Government. For example, Eleazar finally filed his 1986—1990 income tax returns when the District Court ordered the enforcement of three IRS administrative summonses. He also paid some taxes but only to release liens, for example, the 1981 payment to clear title to the Manchester Court Property. It is clear his cooperation and payments were to assist or aid his situation as opposed to willfully complying with the law. The hundreds of thousands of dollars transferred to his children for their benefit over the years can only charitably be char-

acterized as gifts, yet Eleazar did not even bother to file Gift Tax Returns in an effort to camouflage the transfers.

The Debtor's principal argument in opposition to the Government's motion for summary judgment is that there are genuine issues of material fact concerning whether he willfully evaded his taxes. He argues his intent is an issue for trial and that his disorganization is an explanation of failing to file returns. These assertions, however, do not persuade the court to deny summary judgment under the guidance found in *Fegeley*. First, Eleazar states that "he believed" that because he had signed the Form 870, it was unnecessary to file tax returns for those years. The signing of the 870, however, has no legal significance for summary judgment purposes because his signing the Form does not negate the fact that he did not file timely income tax returns for the tax years at issue. *See In re Bruner*, 55 F.3d 195, 200 (5th Cir.1995). Second, Eleazar seems to take the position that his cooperation with the IRS and his later filed returns and limited payments prove that he had not willfully neglected his legal duty. The fact remains, however, that Eleazar habitually failed to timely file and pay and while Eleazar did attempt to pay some tax obligations, he did so only after specific action by the IRS threatened his family's property. Finally, the debtor argues that the record before the court is insufficient for a determination of willfulness on a motion for summary judgment. The court disagrees, however, and finds that no genuine issue of material fact exists to prevent the United States' motion for summary judgment from being granted.

All of the actions by Eleazar, taken together, justify a finding of willful evasion under § 523(a)(1)(C). *See In re Zuhone*, 88 F.3d 469 (taxpayer's transfers of cash, land and stock as gifts to daughters consti-

tuted willful conduct to evade payment of taxes). In this vein, the court notes the case of *Wright v. IRS, supra.*, where on facts similar to the ones presented here, the Southern District of New York affirmed the bankruptcy court's determination that the debtor's income tax liabilities were not dischargeable. In *Wright,* the debtor, an anesthesiologist, earned substantial income but chose to spend the money on expenses other than his income tax liabilities. The debtor spent thousands of dollars on Ivy League educations for his children. 191 B.R. at 293. He also paid substantial credit card debts for his family members and took vacations to Europe, Mexico and around the United States. Furthermore, the debtor in *Wright* sought to avoid IRS levies by forming a personal service corporation and not maintaining bank accounts. While expressing sympathy for the debtor and praising his commitment to family, the court said, "[H]owever noble it may have been to pay his personal family expenses, he did so to his own detriment." *Id.* at 293. In holding his taxes nondischargeable, the court found that the debtor had engaged in manipulation of his personal finances, closed bank accounts to frustrate the IRS, and spent his substantial income on matters other than taxes. *Id.* at 294–95.

Much like the debtor in *Wright,* Eleazar engaged in years of disregard of his obligation to pay taxes while overseeing and directing manipulation of his finances to avoid such payment. The court finds the undisputed facts of this case to be particularly egregious in light of the debtor's education, position and substantial income. The underlying facts are not in dispute. They lead this court to the conclusion that the debtor's conduct over a period of many years constitutes a willful attempt to evade or defeat the payment of income taxes. Such determination mandates a finding that the debtor's income tax obligation for the years 1981—1983 and 1986—1992 are excepted from discharge pursuant to 11 U.S.C. § 523(a)(1)(C).

Plaintiff's motion for summary judgment is, therefore, granted as to the causes of action in the complaint.

### C. *The Debtor's Counterclaim*

The debtor filed a two-count counterclaim in this adversary proceeding. The first claim is for a discharge of certain of the tax penalties incurred pre-petition and the second is for an accounting of the IRS's application of debtor's payments toward the tax debts at issue which include the penalties.

In Count I of Eleazar's counterclaim, he seeks to discharge tax penalties totaling $711,798.86 incurred pre-petition. While the law is well-settled that pre-petition interest is treated as part of the tax claim and is nondischargeable to the extent the underlying taxes are nondischargeable, *See, In re Becker's Motor Transportation, Inc.,* 632 F.2d 242, 250 (3rd Cir.1980); *In re Polston,* 239 B.R. 277, 279 (Bankr.M.D.Pa.1999) (internal citations omitted), the Code treats tax penalties separately from principal and interest. Section 523(a)(7) states tax penalty assessments are dischargeable when "(A) relating to a tax of a kind not specified in paragraph (1) of this subsection; or (B) imposed with respect to a transaction or event that occurred before three years before the date of the filing of the petition." A majority of courts have found that penalties are discharged if the transaction giving rise to the penalty occurred more than three years prior to the filing of the petition. *In re Burns,* 887 F.2d 1541 (11th Cir.1989); *In re Roberts,* 906 F.2d 1440 (10th Cir.1990); *In re Leahey,* 169 B.R. 96, 100 (Bankr.D.N.J.1994). The "transaction or event" that occurred three years before

the petition date, refers to the date the tax was due. *Leahey,* 169 B.R. at 100. *See also, In re Teeslink,* 165 B.R. 708, 717 (Bankr.S.D.Ga.1994); *In re Stoll,* 132 B.R. 782, 787 (Bankr.N.D.Ga.1990). Thus, penalties arising three years before the petition is filed may be subject to discharge.

██ The IRS urges the court to dismiss Count I of the counterclaim because the government has obtained tax liens against the debtor. In support of its argument, the IRS relies upon case law for the proposition that a bankruptcy discharge does not destroy a United States tax lien. *See In re Orr,* 180 F.3d 656 (5th Cir.1999), cert. denied 529 U.S. 1099, 120 S.Ct. 1835, 146 L.Ed.2d 778 (2000); *United States v. Alfano,* 34 F.Supp.2d 827 (E.D.N.Y.1999). However, the discharge of tax penalties pursuant to § 523(a)(7) will not work to destroy the liens held by the government. The IRS cannot make a penalty debt, otherwise dischargeable under the Code, nondischargeable by virtue of the existence of a lien on the tax debt. The IRS motion for summary judgment seeking to dismiss Count I of the debtor's counterclaim is denied.

As for the accounting request, the Government produced Certified Forms 4340 and Certificates of Assessments and Payments. These documents serve as an accounting of the taxpayer's liabilities and any payments or credits applied to said liabilities. Additionally, a declaration by IRS Agent Monica Rivera has been provided by the United States which details the amounts owed by the debtor. Said declaration is entitled to a presumption of correctness. *United States v. Mazzara,* 530 F.Supp. 1380, 1382 (D.N.J.) aff'd, 722 F.2d 736 (3rd Cir.1983). These documents constitute a sufficient accounting and have been produced to the debtor. Thus, the claim for an accounting has been satisfied and summary judgment is granted to the IRS as to Count II of the Counterclaim.

## IV. CONCLUSION

For the foregoing reasons, the United States' motion for summary judgment is GRANTED as to the causes of action in the Complaint and as to Count II of the Counterclaim. The debtor's tax liabilities for the years in issue are nondischargeable under the Bankruptcy Code. Summary judgment is entered for the Plaintiff and Count II of the defendant's counterclaim is dismissed. The attached order has been entered by the court.