In re Bruce BRYEN, Debtor

Bruce Bryen, Plaintiff,

v.

United States of America, Defendant.

Bankruptcy No. 04–10868ELF.

Adversary No. 08–012.

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 13, 2010.

504

A. Fred Ruttenberg, Cherry Hill, NJ, Alexis K. Arena, Flaster/Greenberg P.C., Philadelphia, PA, for Plaintiff.

Beatriz T. Saiz, Benjamin Joseph Weir, United States Department of Justice, Washington, DC, for Defendant.

## OPINION

ERIC L. FRANK, Bankruptcy Judge.

### I. INTRODUCTION

In 2004, Bruce Bryen ("the Debtor") filed a chapter 7 bankruptcy case. In his bankruptcy schedules, the Debtor listed a $19 million general unsecured debt for unpaid taxes ("the Tax Debt") owed to the Internal Revenue Service ("the IRS").[1] This large tax liability was based upon the Debtor's unsuccessful efforts to employ various "tax shelters" in the tax years 1978, 1980, 1982 through 1989.

---

1. As the caption indicates, the technically proper designation of the creditor is "the United States of America." The Debtor initially named the "IRS" as the defendant in his adversary complaint. However, on March 19, 2008, the parties filed a stipulation seeking to amend the caption of the adversary proceeding to name the United States of America ("the United States") as the proper defendant. (*See* Adv. Docket Entry No. 9). The court approved the parties' stipulation on March 24, 2009. (*See* Adv. Docket Entry No. 11). In this Opinion, consistent with common usage in litigation involving the Internal Revenue Service, I will refer to Defendant United States of America as "the IRS."

While the bankruptcy case was open in 2004, neither the Debtor nor the IRS requested a determination regarding the dischargeability of the Tax Debt. In September 2004, the Debtor received a general discharge of his debts and the bankruptcy case was closed a few days later. It appears that the Debtor then assumed that the Tax Debt had been discharged. It turns out that the IRS thought otherwise.

In 2007, the IRS instigated collection activity with respect to the Tax Debt. The IRS' justification for doing so was that, in its view, the Tax Debt had not been discharged in 2004 because, prior to the commencement of his bankruptcy case, the Debtor had willfully attempted to evade or defeat his tax obligations. *See* 11 U.S.C. § 523(a)(1)(C).[2] The Debtor responded by filing a motion in this court to reopen his bankruptcy case so that he could initiate an adversary proceeding to obtain a determination of the dischargeability of the Tax Debt. The court granted the Debtor's request and the Debtor commenced this adversary proceeding.

Quite simply, the Debtor contends that the Tax Debt was discharged in 2004. The IRS contends that the unpaid taxes were not discharged.

For the reasons discussed below, I agree with the IRS and find the Tax Debt nondischargeable. I will enter judgment in favor of the IRS and against the Debtor.

## II. BACKGROUND

The Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on January 21, 2004. (*See* Bankr.Docket Entry No. 1). In his bankruptcy schedules,[3] the Debtor disclosed assets worth $364,300.00 of which $350,000.00 was attributed to a pension. (*See* Bankr.Docket Entry No. 1, Sch. B). He disclosed no secured debt and general unsecured debts of $23,276,069.39. (*See* Bankr.Docket Entry No. 1, Sch. D, F). The Debtor stated in his schedules that $19 million of the $23.3 million in scheduled debt was owed to the IRS for the tax years 1978, 1980 and 1982 through 1989.[4] (*See* Bankr.Docket Entry No. 1, Sch. F). The IRS was, by far, his single largest creditor.[5]

On February 19, 2004, the Chapter 7 Trustee filed a No Asset Report. The court granted the Debtor a discharge pursuant to 11 U.S.C. § 727 on September 9, 2004. (*See* Bankr.Docket Entry No. 27).

---

**2.** Generally speaking (and at the risk of greatly oversimplifying), § 523(a)(1)(A), (B) and § 507(a)(8), read together, render *nondischargeable* taxes for which a return *was due* less than three (3) years before the bankruptcy filing or taxes for which a return *was actually filed* less than two (2) years before the bankruptcy filing. At no time has the IRS asserted that the Tax Debt is nondischargeable under § 523(a)(1)(A) or (B). The sole issue in this proceeding is whether the Tax Debt is nondischargeable under § 523(a)(1)(C).

**3.** I may take judicial notice of the content of documents filed in the case for the purpose of ascertaining the timing and status of events in the case and facts not reasonably in dispute. *See* Fed.R.Evid. 201 (applicable by virtue of Fed. R. Bankr.P. 9017); *In re Scholl*, 1998

WL 546607, at * 1 n. 1 (Bankr.E.D.Pa., Aug.26, 1998); *see also In re Indian Palms Assoc., Ltd.*, 61 F.3d 197, 205 (3d Cir.1995). In this proceeding, I will take judicial notice of the Debtor's bankruptcy schedules.

**4.** At trial in this nondischargeability proceeding, the parties did not include 1978 among the tax years at issue.

**5.** Other large debts the Debtor disclosed in Schedule F were: (a) $2.2 million owed to Federal Financial Co., (b) $1.4 million to the New Jersey Mortgage Finance Agency; (c) $240,000.00 to John Tordini and (d) $230,000.00 to the Estate of Dominick Garofalo. (*See* Bankr.Docket Entry No. 1, Sch. F). The debt to the Estate of Dominick Garofalo will be discussed later in this Opinion.

The Debtor's bankruptcy case was closed on September 13, 2004. At no time during the pendency of the bankruptcy case did the IRS or the Debtor file a complaint to determine the dischargeability of the Tax Debt.

On November 5, 2007, nearly three years after the bankruptcy case was closed, the Debtor filed a motion to reopen his bankruptcy case to file the present adversary proceeding. (See Bankr.Docket Entry No. 31). The court granted the Debtor's motion to reopen his bankruptcy case on January 9, 2008.[6] (See Bankr.Docket Entry No. 39).

On January 15, 2008, the Debtor filed an Adversary Complaint seeking a determination that the Tax Debt was dischargeable. (*See* Adv. Docket Entry No. 1). On February 19, 2008, the IRS filed an Answer denying that the debt was dischargeable. (*See* Adv. Docket Entry No. 4). Trial of this adversary proceeding was held on March 13 and 16, 2009.[7] Three (3) witnesses testified: Catherine Staskin ("Staskin"), a "bankruptcy specialist" employed with the IRS, the Debtor and Carolyn

Walter (the Debtor's current wife). Numerous documents were admitted into evidence at trial. Additionally, the parties identified certain undisputed facts in their Joint Pretrial Statement ("Jt. Pretrial Stmt."). (*See* Adv. Docket Entry No. 55).

Following the trial, I took the case under advisement and provided the parties an opportunity to file post-trial memoranda. Post-trial briefing was completed on July 22, 2009.

### III. FINDINGS OF FACT

Based on careful consideration of the trial record, my assessment of the credibility of the testifying witnesses and the arguments and post-trial submissions made by counsel, I make the following findings of fact:

**A. The Debtor's Accounting Practice and Tax Shelters**

1. The Debtor has been a licensed Certified Public Accountant for approximately 35 years. (1 N.T. at 71).

2. In the 1970s, at the beginning of his career, the Debtor did some general ac-

---

**6.** In a chapter 7 case, neither the Bankruptcy Code nor the Federal Rules of Bankruptcy Procedure impose any deadline for the debtor or a creditor to initiate a proceeding seeking a determination of the dischargeability of a debt, except for proceedings involving debts asserted to be nondischargeable under 11 U.S.C. § 523(a)(2), (4) or (6). The latter proceedings must be initiated during the bankruptcy case, within sixty (60) days after the first date set for the meeting of creditors. *See* Fed. R. Bankr.P. 4007(b), (c).

Because a proceeding to determine the dischargeability of a debt under § 523(a)(1) is not subject to Rule 4007(c)'s sixty (60) day deadline, such a proceeding may be initiated while the bankruptcy case remains open or after the bankruptcy case has been closed. If the dischargeability issue is not raised during the bankruptcy case, it may be determined in a state court or other non-bankruptcy forum in an action the debtor or creditor initiates after the automatic stay has terminated.

Non-bankruptcy fora are said to have "concurrent jurisdiction" to determine the dischargeability of debts in proceedings that are not subject to Rule 4007(c). See Alan N. Resnick & Henry J. Sommer (eds.), 4 Collier on Bankruptcy ¶ 523.04, at 523–17 (16th ed. 2010) ("Collier"). "A party may also move to reopen the bankruptcy case for the purpose of filing a complaint to determine dischargeability, and bankruptcy courts may exercise their jurisdiction to determine the dischargeability issues, or, alternatively, decline to reopen the case." *Id.*

In this instance, I exercised my discretion to reopen the case and exercise my jurisdiction to determine the dischargeability of the Tax Debt. *See* 28 U.S.C. § 1334. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(I).

**7.** I will refer to the Notes of Testimony from March 13, 2009 as "1 N.T." and from March 16, 2009 as "2 N.T."

counting and tax return work. (2 N.T. at 103–05). By the late 1970's, the Debtor had stopped doing this kind of work. (2 N.T. at 105).

3. By the early 1980's, the Debtor was working for an accounting firm that he co-owned with his father, Fred Bryen. The firm was called Bryen & Bryen, PA. (1 N.T. at 80; 2 N.T. at 100). At the time, the Debtor held a 50% interest in that entity.[8] (1 N.T. at 80; 2 N.T. at 85; Jt. Pretrial Stmt. Fact ¶ 9).

4. At Bryen & Bryen, PA, the Debtor's duties primarily consisted of bringing in clients to the firm and assisting clients with securing financing. (2 N.T. at 88, 103–104).

5. In the late 1970's and early 1980's, Fred Bryen formed and promoted tax shelters involving investments in "employee leasing" partnerships. (Jt. Pretrial Stmt. Fact ¶ 10; 2 N.T. at 67–68).

6. Bryen & Bryen, PA recommended these investments to its clients. The clients who made these investments compensated Bryen & Bryen, PA for the associated accounting services the firm provided. (2 N.T. at 87–88).

7. The Debtor personally invested in these employee leasing partnerships for the tax years 1980 and 1982 through 1988. (Jt. Pretrial Stmt. Fact ¶ 14; Exs. 31, 32, 36 & 40; 1 N.T. at 88; 2 N.T. at 69).

8. The Debtor filed tax returns and paid the tax due as reflected on each of the returns for the tax years 1980 and 1982 through 1988. (2 N.T. at 71). The Debtor reviewed, but did not prepare these tax returns. (2 N.T. at 105).

9. The IRS issued notices of deficiencies to the Debtor disallowing his investments in the employee leasing partnerships for the tax years 1980 and 1982 through 1988. (See Jt. Pretrial Stmt. Fact ¶ 12).

10. The Debtor filed three (3) Tax Court petitions challenging the deficiencies. (See Jt. Pretrial Stmt. Fact ¶ 13; Exs. 30, 31, 33, 34, 37, 38 & 41; 1 N.T. at 88–89, 93–94; 2 N.T. at 69–72).[9]

11. The Debtor, along with several other investors, agreed that issues concerning the employee leasing partnership investments and related tax shelters should be tried in a single "test case." That test case resulted in a Tax Court decision reported as *Bealor v. Commissioner*, 72 T.C.M. (CCH) 730, 1996 WL 540109 (1996) ("*Bealor*" or "the *Bealor* Decision"). (See Exs. 32, 36, 40; 1 N.T. at 95; 2 N.T. at 72 & 94).

## B. The *Bealor* Decision and its Impact on the Debtor's Tax Liability and His State of Mind

12. In *Bealor*, the Tax Court considered the following "questions presented for

---

8. In the mid–1980's, Marion Hunt ("Hunt") joined the Debtor and Fred Bryen at the firm and the firm became known as Bryen, Bryen & Hunt. (1 N.T. at 80; 2 N.T. at 101). At this point, the Debtor's ownership interest decreased to a one-third interest. (1 N.T. at 80; 2 N.T. at 101).

In approximately late 1999, a different entity, Bryen & Bryen, LLP, was organized. (2 N.T. at 101). When Bryen & Bryen LLP was formed, Fred Bryen was not active. (2 N.T. at 102). At that point, the Debtor and Hunt were partners in Bryen & Bryen LLP. (*Id.*) The Debtor and Hunt continue to be partners

in Bryen & Bryen LLP at present. (1 N.T. at 73).

9. The Debtor filed the first Tax Court petition on January 20, 1987 to challenge the IRS's notice of deficiency related to his 1979 and 1980 income tax liabilities. (*See* Ex. 31). The Debtor's second Tax Court petition was filed on July 13, 1989 and challenged the IRS's notice of deficiency related to his 1982 income tax liability. (*See* Ex. 34). The Debtor filed the third Tax Court petition on July 8, 1983 to challenge the IRS's notice of deficiency related to his 1983 through 1988 income tax liabilities. (*See* Ex. 38).

decision ... whether the transactions of the seven [ (7) employee leasing] partnerships had (1) economic substance and (2) a profit objective." *Bealor,* 1996 WL 540109, at *9; (Jt. Pretrial Stmt Fact ¶ 15).

13. In 1996, the Tax Court issued its decision in *Bealor.* The Tax Court concluded that "the financial structure of the employee leasing partnerships ... present[ed] *only an image* of genuine lending, borrowing, and investment transactions. The transactions were *shams.*" *Id.* at *46 (emphasis added). (*See also* Ex. 47; 1 N.T. at 83–88).

14. The *Bealor* court held that certain of the financing transactions had neither economic substance nor a profit objective. *Id.* at *59. Specifically, it found that the elaborate transactions underlying the employee leasing partnerships were "examples of the classic circle transactions that lack economic reality, to which we have refused to give effect." *Id.* at *42.

15. The *Bealor* Court further found that the petitioners would not receive taxable income from the transactions because they were shams. It concluded that "[t]he amounts received through the transactions ... must therefore be subtracted from the taxable income reported by those partners for the years at issue, and their partnerships' taxable income thereby reduced." *Id.* at *61.

16. No party in interest appealed the *Bealor* Decision.

17. Once the *Bealor* Decision was final, the Debtor knew that he would be subject to additional tax liability and that the IRS would send him notice of the amount the IRS believed that he owed. While the Debtor knew that he also would be subject to interest and penalties, he did not know, at that time, the precise amount of additional tax that ultimately would be assessed. (2 N.T. at 107–109).[10]

18. The *Bealor* Decision did not result in any additional personal tax liability for the Debtor other than that related to the Debtor's investments in employee leasing partnership investments and tax shelters for tax years 1980 and 1982 through 1988. *Id.*

## C. Post-*Bealor* Negotiations and Settlement of the Debtor's Tax Liability, the Debtor's Non-payment of His Tax Debt and the IRS' Assessment of Penalties and Interest

19. For approximately five (5) years after the *Bealor* Decision was issued in 1996, the Debtor did not receive any communication from the IRS regarding the specific amount of his additional tax liability. (2 N.T. at 109).

20. In the Spring/Summer of 2001, the IRS contacted the Debtor and began negotiating the amount of his outstanding tax liability with him. His accounting firm partner, Hunt, assisted him in those negotiations. (2 N.T. at 72 & 109–110).

21. These negotiations were not limited to the additional tax liability the Debtor faced as a result of the *Bealor* Decision. They also encompassed tax issues relating to the Debtor's "professional corporation." [11] (2 N.T. at 112).

---

10. The Debtor testified that, at that time, he did not anticipate that his liability would exceed $1 million because he expected that his additional tax liability, including interest and penalties, would be offset by credits resulting from the reversal of the income previously reported. (2 N.T. at 107–108).

11. The Debtor explained that his "professional corporation" had guaranteed some loans in a business investment and that the business filed for bankruptcy. The Debtor's corporation had to make payments on those loans for about seven (7) or eight (8) years and the IRS treated those payments as if they were income to the Debtor. (2 N.T. at 112). The Debtor did not identify the specific corporation to

22. On June 27, 2002, the parties' negotiations culminated in the Debtor signing three (3) stipulations with the IRS ("the 2002 IRS Stipulations"). (*See* Exs. 33, 37 & 41; 1 N.T. at 93; 2 N.T. at 114). All three (3) stipulations stated that the Debtor owed taxes due to substantial underpayment attributable to tax motivated transactions. (Exs. 33, 37 & 41).

23. By the time the Debtor signed the 2002 IRS Stipulations, he fully understood the magnitude of his outstanding tax liability. (1 N.T. at 94–95, 164).

24. The 2002 IRS Stipulations set forth the Debtor's tax deficiency for the tax years 1980 and 1982 to 1988 as follows:

| Year | Deficiency Income Tax | Additions to the Tax–I.R.C. | | Total |
|---|---|---|---|---|
| | | § 6653(a)(1)/(A) | § 6661 | |
| 1980 | $ 25,522.00 | $ – | $ – | $ 25,522.00 |
| 1982 | $ 52,822.00 | $ 2,641.00 | $ 13,206.00 | $ 68,669.00 |
| 1983 | $ 29,145.00 | $ 1,457.00 | $ 7,286.00 | $ 37,888.00 |
| 1984 | $ 120,212.00 | $ 6,011.00 | $ 30,053.00 | $ 156,276.00 |
| 1985 | $ 261,938.00 | $ 13,097.00 | $ 65,485.00 | $ 340,520.00 |
| 1986 | $ 525,596.00 | $ 26,280.00 | $131,399.00 | $ 683,275.00 |
| 1987 | $1,125,439.00 | $ 56,272.00 | $281,360.00 | $1,463,071.00 |
| 1988 | $ 25,556.00 | $ 1,278.00 | $ 6,389.00 | $ 33,223.00 |
| **TOTAL** | $2,166,230.00 | $107,036.00 | $535,178.00 | $2,808,444.00 |

(*See* Ex. 33, 37 & 41).[12]

25. The IRS signed the 2002 IRS Stipulations on November 29, 2002. (*See* Exs. 33, 37 & 41; 2 N.T. at 114).[13]

26. Subsequently, the 2002 IRS Stipulations were entered as Decisions of the Tax Court. (*See* Exs. 33, 37 & 41).

27. The Debtor has never made any payments toward his outstanding tax liability. (1 N.T. at 171; 2 N.T. at 97).

28. On April 22 and 29, 2003, the IRS assessed the Debtor for each of the tax years at issue and the Debtor received a notice of each assessment as follows:

| Assessment Date | Tax Year | Tax Deficiency | Interest | Penalty | Total |
|---|---|---|---|---|---|
| April 22, 2003 | 1980 | $ 25,522.00 | $ 266,593.20 | $ – | $ 292,115.20 |
| April 29, 2003 | 1982 | $ 52,822.00 | $ 467,816.73 | $ 13,206.00 | $ 533,844.73 |
| April 29, 2003 | 1983 | $ 29,145.00 | $ 224,653.72 | $ 7,286.00 | $ 261,084.72 |
| April 29, 2003 | 1984 | $ 120,212.00 | $ 803,077.21 | $ 30,053.00 | $ 953,342.21 |
| April 29, 2003 | 1985 | $ 261,938.00 | $ 1,496,534.17 | $ 65,485.00 | $ 1,823,957.17 |
| April 29, 2003 | 1986 | $ 525,596.00 | $ 2,629,636.05 | $131,399.00 | $ 3,286,631.05 |
| April 29, 2003 | 1987 | $1,125,439.00 | $ 4,869,216.04 | $281,630.00 | $ 6,276,285.04 |

which he was referring. Therefore, I do not know if this was an entity related to his accounting practice or some other separate business venture. For purposes of my decision, such detail is unnecessary.

12. The chart above is a summary of Exhibits 33, 37 and 41. There was no deficiency in income tax due for the taxable year 1979.

13. At the time he signed the 2002 IRS Stipulations, the Debtor was advised by his attorney that the stipulations would not constitute final agreements until the government signed them. (2 N.T. at 114).

| April 29, 2003 | 1988 | $ 25,556.00 | $ 96,919.70 | $ 6,389.00 | $ 128,864.70 |
|---|---|---|---|---|---|
| Total | | $2,166,230.00 | $10,854,446.82 | $535,448.00 | $13,556,124.82 |

(Exs. 48–55; 2 N.T. at 75, 97).[14]

29. When the Debtor received the April 22 and 29, 2003 assessment notices, he understood each assessment to reflect the amount he owed the IRS.[15] (Exs. 48–55; 2 N.T. at 75).

30. The Debtor understood that the notices of assessment requested payment of the taxes. (2 N.T. at 97–98).

**14.** The chart above is a summary of Exhibits 48–55. Staskin, a bankruptcy specialist with the IRS for twenty-one years, explained that prior to the date of the assessment, there is no specific amount of liability on the IRS's books to collect. The date of assessment is the date the tax actually was inputted into the computer system. (1 N.T. at 53–54).

**15.** A first notice is automatically generated and sent to the taxpayer when the IRS first enters the assessment into the computer system. (1 N.T. at 54).

**16.** Staskin explained that the IRS can send a total of four notices to a taxpayer. (1 N.T. at 33). Typically, the IRS will send a second notice if there has been no response from the taxpayer within ten (10) to fifteen (15) days after the first notice was issued. (1 N.T. at 58). The IRS will send a third notice thirty (30) days after the second notice. (1 N.T. at 58). If a second and/or third notice is issued, it is generally reflected on the IRS's transcript for the taxpayer. (1 N.T. at 33, 35). The fourth notice is the final demand for payment and a request that the taxpayer contact the IRS regarding payment options. It also advises the taxpayer of the possible consequences for not responding, such as a lien or levy. (1 N.T. at 56–57). The fourth notice issues if there has been no response to the third notice within a twenty (20) to thirty (30) day time period. (1 N.T. at 58).

The IRS' transcripts indicate that a fourth notice was sent to the Debtor for the tax years 1980 and 1982 through 1988 on either June 9, 2003 or June 16, 2003. (Exs.48–55).

31. A "Fourth Notice" for each year's tax liability was sent to the Debtor by June 16, 2003.[16]

32. In January 2004, a "correctional officer" from the IRS called the Debtor and the Debtor told the caller that he was in the process of filing a bankruptcy petition. (2 N.T. at 75–76).

However, the Debtor claimed that he never received a second, third or fourth notice. (2 N.T. at 115). Instead, the Debtor claims that the first time he heard from the IRS after the April 2003 assessment was in the middle of January 2004, approximately one (1) week prior to the filing of his bankruptcy petition. (2 N.T. at 75–76, 115).

Staskin acknowledged that the IRS transcripts show no evidence of a second or third notice being sent to the Debtor. (1 N.T. at 55). Staskin provided a possible explanation for this omission. She suggested that, perhaps, the IRS expedited issuance of the Fourth Notice because there was an agreed-upon assessment for Bryen. (1 N.T. at 57, 59–60). This theory finds support in the fact that the IRS transcripts reported that the fourth notice was sent to Bryen five (5) weeks after the April 2003 Assessment, which is faster than the normal process for sending out all four notices. Staskin also said that if the IRS has been in contact with the taxpayer, and they are trying to work out an agreement for payment, there would be no need for a fourth notice. (1 N.T. at 57–62).

I credit Staskin's testimony. I find it likely that the IRS streamlined the "notice process" for the Debtor's tax account. He received a first notice in April 2003 at the time of the first assessment and then a final, fourth notice approximately five (5) weeks later in June 2003. Given that the IRS began negotiations with the Debtor a year and a half prior and already agreed upon his tax liability by 2002, it is more likely the IRS chose to shorten the collection process and went straight to a fourth notice.

### D. The Debtor's Financial Affairs and Lifestyle

#### 1. The Debtor's income

33. For the years 1996 through 2001, the Debtor earned an income of at least $62,700.[17] (Ex. 131 at 66–75).

34. In 2001 the Debtor earned an income of at least $80,000.00. (Ex. 131 at 76).

35. In 2002, the Debtor had "good year" and earned an income of approximately $190,000.00. (1 N.T. at 141).

36. In 2003, the Debtor earned an income of at least $87,000.00. (Ex. 131 at 80).

37. When the Debtor filed his bankruptcy petition in January 2004, he reported a monthly gross income of $10,417.00, which amounts to almost $125,000.00 per year. (*See* Bankr.Docket Entry No. 1, Sch. I).

#### 2. The Debtor's Relationship with Carolyn Walter and their Financial Arrangements for Paying Living Expenses

38. In 1993, the Debtor met Carolyn Walter ("Walter"). (1 N.T. at 68; 2 N.T. at 6; Jt. Pretrial Stmt. Fact ¶ 17). Walter holds a doctorate degree in social work and is a college professor. (2 N.T. at 5).

39. In late 1994, the Debtor and Walter began living together at Walter's three (3) bedroom home located at 22 Mallard Mill Run Road in Wallingford, Pennsylvania ("the Mallard Mill Run Residence"). (2 N.T. at 6; 1 N.T. at 69; Jt. Pretrial Stmt. Fact ¶ 17). The Debtor and Walter lived in the Mallard Mill Run Residence until 2003. (1 N.T., 69).

40. Initially, Walter paid for all of the couple's expenses. (2 N.T. at 6).

41. In approximately 1997, the Debtor and Walter decided to split expenses and formalize the division of those expenses. (*Id.*). Starting in 1997, the Debtor paid for fifty percent (50%) of the expenses, property taxes, utilities, maintenance, and repair costs of the Mallard Mill Run Residence. (2 N.T. at 6–7).

42. In 1997, Walter opened a checking account in her name at PNC Bank to be used to pay the couple's joint expenses. (*Id.*).

43. At the time Walter opened the PNC Bank account, the Debtor stopped using a checking account to avoid the risk of having it attached by one of his creditors.[18] (1 N.T. at 104–108; 2 N.T. at 81–

---

17. The Debtor attempted to prove that his adjusted gross income for 1996 through 2003 was negative, i.e., that he lost money. For example, the Debtor's 1996 tax return disclosed an adjusted gross income of *negative* $413,124.00, (1 N.T. at 48–49), a figure that was not challenged by the IRS. The Debtor filed tax returns with a negative adjusted gross income for the years 1997 through 2003. (*Id.* at 49–52).

 To the extent the Debtor hoped to prove that large deductions/losses resulted in him demonstrated that he was in difficult financial circumstances with little personal cash flow between 1996 and 2003(and therefore, that he lacked the requisite intent to evade or defeat the Tax Debt), he simply did not sufficiently develop the record. As set forth in Findings of Fact Nos. 33–37, the Debtor had substan-

tial earned income, in the years after the *Bealor* decision (albeit varying over that time period). Based on his income level, as well as the evidence relating to his lifestyle (detailed later in this Opinion), I conclude that the Debtor did not lack for cash from year to year. Therefore, I cannot give weight to his implied argument that his tax "losses" excused him from his making payments toward his tax liability, particularly in the years from 2001 through 2003.

18. The Debtor attributed part of the cause of his lack of a personal checking account to the Garafalo Estate, the same debt the Debtor scheduled as owed to "The Estate of Dominick Garafalo" for $230,000.00 on Schedule F. In the late 1990's, the Debtor was embroiled in litigation concerned a loan transaction between two parties whom the Debtor had in-

83).

44. Both the Debtor and Ms. Walter funded the PNC Bank account. The Debtor made cash deposits[19] and deposited checks from Bryen & Bryen, LLP into the PNC Bank account to pay for his half of the couple's bills. (1 N.T. at 114–115; 2 N.T. at 7).[20] Walter would transfer money from one of her other accounts, typically a money market account, into the PNC Bank Account to pay her half of the expenses. (2 N.T. at 7).

45. Each month, the Debtor and Walter reviewed their bills together and the Debtor would write the necessary checks, which Walter would sign because the PNC Bank account was in her name. (2 N.T. at 7; 1 N.T. at 114, 120–121). On occasion, the Debtor would use Walter's signature stamp. (1 N.T. at 120–21).

46. At some point, Walter closed the PNC Bank account and opened a checking account with Commerce Bank. Again, only Walter's name was on the Commerce Bank account. (1 N.T. at 115, 121, 152; 2 N.T. at 46).

47. The Debtor and Walter used the Commerce Bank account to pay their joint bills in the same way they had used the PNC Bank account. (1 N.T. at 121–122).

48. The Debtor typically paid his personal expenses (*i.e.*, expenses that were not joint) directly from the account of his

business, Bryen & Bryen, LLP (1 N.T. at 110; *see, e.g.*, Ex. 93).

49. In 1996, Walter bought property in Rehoboth Beach on which she built a home ("the Rehoboth Beach House"). (2 N.T. at 9). Walter paid for the land and for the builder to build the Rehoboth Beach House with her personal funds. (*Id.*) The Rehoboth Beach House is in Walter's name only. (*Id.*).

50. Typically, Walter and the Debtor make trips to the Rehoboth Beach House during the summer months, from June through the end of August. (2 N.T. at 10).

51. Since the house was built in 1996, the Debtor has paid for fifty percent (50%) of the expenses related to the Rehoboth Beach House, including the utilities, insurance, property taxes, maintenance and repair costs. (2 N.T. at 9–11).

52. Between 2001 and 2003, the Debtor and Walter jointly paid over $10,000.00 toward maintenance and landscaping of the Rehoboth Beach House. (1 N.T. at 144; 2 N.T. at 42–43, 46, 49; Exs. 95 & 97).

53. In 2001, the Debtor and Walter married. (1 N.T. at 68; 2 N.T. at 15; Jt. Pretrial Stmt. Fact ¶ 18). They spent approximately $5,000.00 on their wedding, equally splitting the cost. (2 N.T. at 35–36).

troduced to each other; both were clients of his, one of them being Dominick Garafolo. (2 N.T. at 77–78). At a certain point the borrower defaulted. The lender (Garafolo) passed away and his estate sued the Debtor. (*Id.*). The Garafolo Estate obtained a judgment against the Debtor and later attempted to enforce that judgment against the Debtor's assets. (*Id.*). The record does not reveal precisely when the judgment was entered. Ultimately, an order was entered in that proceeding requiring the Debtor to pay $1,750.00 a month for about twelve (12) years. The Debtor started making payments required by the order starting in late 2002 or early 2003.

In 2003, the Debtor paid $25,000.00 on the judgment. (1 N.T. at 168–169; 2 N.T. at 77–78, 98,115).

19. From approximately the late 1990's to or through 2003, the Debtor regularly took his paycheck to the bank and cashed it. (1 N.T. at 104). Presumably, this was the source for the cash deposits.

20. Both the Debtor and Walter acknowledged that any cash deposits made to the PNC Bank Account and, later to the Commerce Bank Account, came from the Debtor. (1 N.T. at 115; 2 N.T. at 37–38).

54. In 2003, the Debtor and Walter moved from the Mallard Mill Run Residence to a four (4) bedroom townhome located at 502 Guinevere Drive in Newtown Square, Pennsylvania ("the Guinevere Drive Residence"). (1 N.T. at 68, 165).

55. The Guinevere Drive Residence is held in Walter's name only. (2 N.T. at 8). The down payment came from the proceeds of the sale of the Mallard Mill Run Residence. (*Id.*).

56. Since moving into the Guinevere Drive Residence, Walter and the Debtor have each paid fifty percent (50%) of the monthly mortgage payments and all of the other expenses related to the home, including property taxes, insurance, maintenance and repair costs. (1 N.T. at 165; 2 N.T. at 8–9).

57. In 2003, the Debtor and Walter paid over $11,000.00 to build a deck and for maintenance or other enhancements for the Guinevere Residence. (2 N.T. at 53–54; Ex. 97 at 1271, 1307).

58. In late 2003 or early 2004, shortly before filing the bankruptcy case, the Debtor opened a checking account in his name. (1 N.T. at 107–108).

59. In his bankruptcy schedules, the Debtor reported a monthly mortgage payment of $1,050.00. (*See* Schedule J.)

### 3. The Debtor's Travel with Walter

60. The Debtor and Walter have taken at least one vacation together in the summer and one in the winter every year since they met in 1993. (2 N.T. at 19).

61. In 2001, the year the Debtor and Walter were married, the Debtor incurred approximately $25,000.00 in charges on one of his American Express cards for the couple's travel-related expenses. Those expenses included the costs for airfare to and tours in Spain, Portugal, St. John and an evening at the Four Seasons Hotel in Philadelphia, Pennsylvania. Other expenses incurred that year were related to future trips to Costa Rica and St. Lucia. (1 N.T. at 126, 129, 132; Ex. 90).

62. In 2002, the Debtor had approximately another $25,000.00 in charges on one of his American Express cards for travel-related expenses for the couple. Those expenses included the costs for airfare and tours in Costa Rica, Panama City, France and St. Lucia. Other expenses incurred that year were related to a future three-week trip to Australia that cost $13,260.00. (1 N.T. at 130–136; Ex. 90).

63. In 2003, the Debtor and Walter took their previously paid, three-week trip to Australia. They also made a partial payment of $2,200.00 toward a "Mediterranean Journey" for 2004. (1 N.T. at 124–125, 135; 2 N.T. at 25; Exs. 90 & 105).

64. Prior to 2004, the Debtor and Walter also traveled to Italy, Austria, Germany, Switzerland, Montauk, Mexico, Belize and Arizona.[21] (2 N.T. at 20–23, 26–27, 30).

65. In 2004, the Debtor and Walter went to the Mediterranean. The balance of the Mediterranean trip was paid by credit card on March 26, 2004, after Bryen filed the bankruptcy case. The total cost of the trip, including the 2003 partial payment, was $7,980.00. (Ex. 105 at 1680; 1 N.T. at 125).

66. The Debtor and Ms. Walter shared the expenses for their vacations equally.[22]

21. The record does not account for the precise dates of all of these trips or how much they cost.

22. The Debtor suggests that his share of air travel was generally paid for with frequent flyer miles, thus implying that his share of the travel expenses was not extravagant. (1 N.T. at 135). There is ample evidence in the record to suggest otherwise—*i.e.,* that both the Debtor's and Walter's flights were paid for by credit card. (*See* Ex. 90)

(Jt. Pretrial Stmt. Fact ¶ 20).

67. The American Express credit card used to pay for much of the joint travel expenses was paid in full each month with a check from Walter's PNC Account. *See* (Ex. 91).

### 4. The Debtor's Support of his Mother

68. Fred Bryen died in 2002 and left his wife, the Debtor's mother, with no assets or estate. (2 N.T. at 112–113).

69. Since May 2001, the Debtor has been paying the rent for his mother's apartment in an amount between $1,199.00 and $1,256.00 per month. (1 N.T. at 163).

### 5. The Debtor's Other Monthly Expenses

70. When the Debtor filed his bankruptcy case in 2004, he reported the following monthly expenses: $500.00 for utilities; $300.00 for home maintenance; $650.00 for food; and $500.00 for clothing. (*See* Sch. J).

71. The Debtor also allocated one-quarter of his gross monthly pay, $2,500.00 per month, for recreation. (*Id.*).

### E. The Debtor's Failure to Pay His Tax Liability

72. The Debtor filed his tax returns for each of the years at issue. He also paid the reported tax due at that time.

73. The Debtor has not made any payments on the Tax Debt since the *Bealor* decision in 1996.

## IV. *DISCUSSION*

### A. Legal Standard

#### 1. § 523(a)(1)(C)

Section 523(a)(1)(C) excepts from discharge any debt for taxes "with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax." 11 U.S.C. § 523(a)(1)(C). Section 523(a)(1)(C) is comprised of two disjunctive provisions, one involving fraudulent tax returns and the other involving "willful evasion" of a tax debt. *See In re Scarpiello,* 240 B.R. 203, 208 (Bankr.E.D.Pa.1999). In the instant matter, the IRS contends that the debt the Debtor owes to the IRS should be excepted from discharge under the second part of the discharge exception, *i.e.,* "willful evasion."

■ As is true with respect to most other § 523(a) discharge exceptions, § 523(a)(1)(C) is strictly construed in favor of the debtor. *In re Fegeley,* 118 F.3d 979, 983 (3d Cir.1997) (citing *Dalton v. I.R.S.,* 77 F.3d 1297, 1300 (10th Cir.1996)). At the same time, however, as the Court of Appeals observed in *Fegeley,* § 523(a)(1)(C) is drafted in broad terms. Conduct that "in any manner" constitutes an attempt to evade or defeat a tax renders the tax debt nondischargeable. *See* 118 F.3d at 983.

■ The IRS bears the burden of proof on the issue of dischargeability, even though the Debtor is the plaintiff in this proceeding. *Id.* The IRS must prove by a preponderance of the evidence that the Debtor willfully attempted in any manner to defeat or evade his taxes. *Id.* (citing *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)).

#### 2. *Fegeley*

*Fegeley* is the seminal case in this Circuit under § 523(a)(1)(C). It established the analytical framework to be applied in nondischargeability proceedings under that provision.

■ The *Fegeley* court began its analysis by cautioning, as have many other courts, that a debtor's failure to pay his taxes, by itself, does not render the tax debt nondischargeable under § 523(a)(1)(C). *Fegeley,* 118 F.3d at 983. Rather, the failure to pay is treated as

relevant evidence to be considered as part of the totality of the circumstances in evaluating whether a debtor attempted to willfully evade or defeat a tax. *Id.*

■ The *Fegeley* court held that the "willful evasion" clause of § 523(a)(1)(C) requires proof of two elements: (1) a conduct requirement (*i.e.*, the debtor must engage in some "conduct" that constitutes an attempt to evade or defeat the tax); and (2) a scienter requirement (*i.e.*, the debtor's mental state must be that he acted "willfully"). *Id.* at 983–84.

■ With respect to the "conduct" element, the *Fegeley* court held that both affirmative conduct and culpable omission (like the knowing failure to file tax returns) may serve to satisfy the require-

ment. *Id.* As for the scienter element, the court held that § 523(a)(1)(C) employs what it termed the "civil" (as opposed to the "criminal") test for "willfulness": *i.e.*, the debtor's attempts to avoid his tax liability must be "voluntary, conscious, and intentional." *Id.* at 984 (internal quotations and citations omitted).[23]

### B. The Relevant Time Period to be Considered In Assessing the Debtor's Conduct and Scienter

■ The IRS argues that the Debtor's evasive conduct began after the *Bealor* Decision was issued in 1996.[24] (2 N.T. at 62–63). The IRS asks the court to closely examine the lifestyle the Debtor led in the period between *Bealor* and the bankruptcy filing and from that period up until he filed

**23.** *Fegeley* involved a 50–year–old salesman who had sufficient funds to pay his taxes, but failed to do so. After receiving communication from IRS agents, Fegeley filed the outstanding tax returns. The IRS did not assert that the tardy tax returns were fraudulent. Nonetheless, the government brought criminal charges against Fegeley for a willful failure to file his tax returns and he pled guilty to those charges. He later filed a bankruptcy case and received a discharge. Much like this case, after the IRS initiated post-discharge collection efforts, Fegeley and his wife reopened their bankruptcy case and commenced an adversary proceeding to determine the dischargeability of his tax debt. The bankruptcy court held that the debt was dischargeable—specifically, that his failure to file income tax returns, in connection with his failure to pay those taxes, even when he had the ability to pay, did not constitute an attempt to willfully evade or defeat his tax liability. On appeal, the Court of Appeals reversed. The court applied the legal standards discussed above in the text and concluded that Fegeley's failure to file his tax returns, when he knew he had the duty to do so and had sufficient funds to pay the taxes, met both elements for nondischargeability due to "willful evasion" under § 523(a)(1)(C).

Many other cases decided under § 523(a)(1)(C) involve a debtor's failure to file tax returns. *See, e.g., In re Fretz,* 244 F.3d

1323 (11th Cir.2001); *In re Eleazar,* 271 B.R. 766 (Bankr.D.N.J.2001); *In re Weiss,* 237 B.R. 600 (Bankr.E.D.Pa.1999), aff'd in part, rev'd in part, 2000 WL 1708802 (E.D.Pa. Nov.15, 2000), aff'd, 276 F.3d 582 (3d Cir. 2001) (Table), amended & superceded by 32 Fed.Appx. 32 (3d Cir. Feb.20, 2000) (Table).

I note that the conduct at issue in this matter differs materially from that in *Fegeley.* This case is not about a debtor's failure to file his tax returns. Rather, this proceeding concerns the Debtor's conduct during the time period after a determination was made that the *timely filed returns* contained substantial deficiencies, as well his conduct after those deficiencies were assessed. Thus, although the legal standards set forth in *Fegeley* are instructive—and indeed, binding on this court—the facts of *Fegeley* do not provide much assistance in analyzing how those standards should be applied in this case.

**24.** The IRS also argues that the Debtor's conduct in the 1980's—in particular, his participation in tax shelter transactions found to lack economic substance—supports a finding of willful evasion under § 523(a)(1)(C). *See* IRS Mem. at 19–20. I do not reach the issue and do not rely on the findings in the *Bealor* decision. Rather, I base my findings solely on the Debtor's *post-Bealor conduct,* particularly after January 2001, and the inferences that I have drawn regarding his state of mind.

the bankruptcy case and suggests that it is indicative of willful evasion of his tax obligations. The Debtor's view is that the propriety of his conduct should be considered only for the time period after November 2002, when the IRS signed the 2002 IRS Stipulations because, prior to that date, he had no actual notice of the conclusive amount of the Tax Debt.

I agree with the IRS that the Debtor's conduct and state of mind in the entire post-*Bealor* period may be considered, but with some qualification.

The Debtor is correct when he points out that at the time the *Bealor* Decision was issued in 1996, he had no actual notice of the specific dollar amount he owed. Even so, I find it impossible to believe that, post-*Bealor*, the Debtor lacked notice that he was responsible for a *quite substantial* additional tax payment. At the same time, the fact that it took the IRS an inordinate amount of time after *Bealor*— about five years!—to contact the Debtor and commence the process of quantifying and assessing the Tax Debt, complicates my evaluation of the Debtor's conduct and state of mind in the 1996–2001 time period.

Between 1996 and 2001, the Debtor was in something of a state of limbo. He knew that he faced that a huge tax liability, but the tax was unliquidated, unassessed and not subject to the IRS' enforcement remedies. During that time, the Debtor appears to have fallen off of the IRS' "radar screen." This state of affairs differs substantially from many § 523(a)(1)(C) cases in which a debtor's conduct is evaluated after he or she fails to file tax returns at all or having done so, the amount of a tax debt has been determined and assessed. Nevertheless, the unliquidated, unassessed status of the Tax Debt does not render irrelevant everything that occurred in the post-*Bealor*/pre-assessment time period. If that were true, the failure to file tax returns (conduct that causes the taxes due to remain unliquidated and unassessed) could not support a finding of nondischargeability finding under § 523(a)(1)(C) and, as *Fegeley* makes clear, that is not what the law provides. I conclude that the peculiar posture in which the Debtor found himself between 1996 and 2001 (after *Bealor* but before the commencement of the negotiations that resulted in the assessment of the Tax Debt) must be considered carefully and cautiously before any inferences or conclusions are drawn regarding the Debtor's conduct and scienter, but that evidence from that time period is relevant.

Finally, before applying these principles to the facts of the case, I emphasize that the Debtor's situation changed dramatically once the IRS contacted the Debtor in 2001 and particularly after he signed the Stipulations in June 2002. By then, the Debtor knew the specific magnitude of his tax liability. His conduct thereafter is especially relevant in assessing the two prongs of the test for nondischargeability under § 523(a)(1)(C). Therefore, while I will consider the entire post-*Bealor* time period relevant in assessing the Debtor's conduct and state of mind, I will concentrate my analysis on the period from January 2001 through January 2004.

### C. The Debtor's Tax Liability Is Not Dischargeable

#### 1. the Debtor's Conduct

 The IRS asserts that the Debtor acted to evade the Tax Debt in at least two (2) ways: (1) by failing to make some payment on his taxes when he had the means to do so; and (2) by dealing in cash, paying debts through and in the name of others, and living a lavish lifestyle.[25] IRS

---

25. The Debtor contends that the manner in which he may have "dealt in cash" cannot

support a nondischargeability finding under § 523(a)(1)(C) case because there is no evi-

Mem. at 21–23. I agree.[26]

Here, the Debtor earned significant income during the relevant years prior to filing his bankruptcy petition. Most notably, from 2001 through 2003, he earned a minimum of $80,000.00, which amounts to an average monthly income of approximately $7,000.00. He acknowledges that in 2002, he had "good year" and earned $190,000. And, at the time he filed his bankruptcy case, he reported that he earned approximately $10,000.00 per month, before taxes.

The Debtor also had only modest, fixed living expenses. According to Schedule J, he had a mortgage obligation of $1,050.00 per month.[27] And, while he also paid his mother's rent, which was approximately $1,200.00 per month, he reported no other regularly recurring financial obligations aside from modest expenditures for utilities, home maintenance, food and clothing ($1,950.00 total per month). Meanwhile, he allocated one-quarter of his gross monthly pay, $2,500.00 per month, for recreation.

Perhaps as a result of the modest level of his fixed living expenses, the Debtor had at his disposal a substantial amount of discretionary income for the critical years at issue. During those years, he paid at least $12,000.00–$13,000.00 per year for vacations (that is his approximate share). The Debtor also had the luxury of maintaining two residences (one being a vacation home), albeit jointly with his wife. Certainly, to the extent that the Debtor's lifestyle can be characterized as lavish, such conduct is encompassed by the § 523(a)(1)(C) discharge exception. *See In re Lacheen*, 365 B.R. 475 (Bankr.E.D.Pa. 2007). Regardless whether the label "lavish" is employed here, I am convinced that the Debtor had ample income from which he could have made at least some payment on the Tax Debt.

Further, I can find no plausible explanation—except to avoid payment to creditors—why a sophisticated professional, like

dence, or any allegations for that matter, that the Debtor or his business ever improperly reported income. In other words, the IRS does not accuse the Debtor of dealing in cash in a way that is linked directly to a failure to report income. The Debtor also argues that the term "dealing in cash" has been used to address situations where the taxpayer hides or conceals assets from the government through use of cash transactions. The Debtor cites to *In re Grow*, 1997 WL 595088 (Bankr. S.D.Ala. May 30, 1997) as an example of a case involving a debtor who had neither a personal nor business checking account (the Debtor had one with Bryen & Bryen LLP) and the court found that such failure to maintain a checking account in his name was insufficient to prove nondischargeability under section 523(a)(1)(C).

I am unpersuaded by this argument. Conduct rendering a tax debt nondischargeable is not limited to tactics employed to conceal unreported taxable income. "Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation." *Fegeley*, 118 F.3d at 983 (internal quotations and citations omitted). Practices, such as "dealing in cash," may cause a debt to be nondischargeable under § 523(a)(1)(C) if employed to evade payment even after the taxes have been reported and assessed. *See In re Guben*, 2008 WL 3875354, at *2 (Bankr.E.D.Pa. Aug.14, 2008); *In re Jacobs*, 2006 WL 2691516, at *14 (M.D.Fla. Sept.19, 2006), *aff'd*, 490 F.3d 913 (11th Cir.2007); *In re Klayman*, 333 B.R. 695, 702–03 (Bankr.E.D.Pa.2005).

26. To some extent, the discussion that follows in the text also involves the "mental state" element under § 523(a)(1)(C). Determining whether there was tax evasion "conduct" tend to merge with the evaluation of a debtor's intentions to some extent and vice versa.

27. I infer that this figure represents the Debtor's share of the mortgage that he split equally with Walter.

the Debtor, who had no more than one dependent (his mother), and who was earning sufficient income to maintain a comfortable lifestyle, would conduct his personal financial affairs without a checking account, transacting his personal business entirely in cash or through third parties. This conduct, too, contributes to my finding that the IRS has satisfied the "conduct" element of willful evasion under § 523(a)(1)(C).

The Debtor disputes that the manner in which he conducted his personal financial affairs was related to his tax liability to the IRS. He concedes that he ran his affairs in a manner that was designed to thwart the collection efforts of a creditor. He argues, however, that he was concerned about a different creditor—the Garafalo Estate—not the IRS.[28] In his testimony, the Debtor explained that he was concerned that the Garafalo Estate "could have attached a checking account" and because the accounting firms "wrote checks for me ... I didn't really need a checking account." (1 N.T. at 104).[29]

The Debtor's argument is unpersuasive. Significantly, he acknowledges that the manner in which he conducted his financial affairs was intended to evade payment of a debt. In making this argument, the Debtor has proceeded down a slippery slope. He has conceded that his conduct was both evasive and willful. While perhaps there are circumstances in which such a concession can be limited to one creditor and not another, the Debtor is attempting to draw a very fine line. I conclude that the line cannot be drawn in this case.

While the Debtor contends that the personal financial management system he de-

vised in the late 1990's was designed to protect his assets from the Garafalo Estate, it served precisely the same function as to the IRS. I recognize that prior to the 1997–2001 time period, the IRS Tax Debt had not yet been assessed and therefore, there was no imminent danger that the IRS would attach his assets. However, it is hard to imagine that the outstanding, albeit unassessed, huge Tax Debt did not loom over the Debtor like a sword of Damocles. Consequently, it is more likely than not that the Debtor was well aware of and comforted by the protection provided his peculiar financial management system afforded him from future IRS collection activities even before the assessment of the Tax Debt.

Moreover, examination of other conduct in the 2002–2004 time frame persuades me that there was a nexus between the manner in which the Debtor conducted his affairs and the Tax Debt. In that time frame, he was subject to a court order pursuant to which he made instalment payments ($1,750.00 monthly) on his obligation to the Garafalo Estate. While the record is not explicit on this point, I infer that the Debtor's performance under a court order payment plan obviated any serious concerns he may have had about attachment of any bank account he might maintain. Yet, even though it appears that the risk of bank account attachment was eliminated, the Debtor neither established a checking account nor made any payments to the IRS until shortly before he filed his bankruptcy case on January 21, 2004. By the time he did so, it is likely that he was aware that the bankruptcy filing, along with the protection provided by the auto-

---

**28.** The Garafalo Estate obtained a substantial judgment against the Debtor in the late 1990's. *See* n. 18, *supra.*

**29.** The Debtor also said that "it was very much easier for me to have my accounting

firm write checks, rather than transferring it from the accounting to my personal account and then writing checks out of my personal account...." (1 N.T. at 105). I find this testimony wholly lacking in credibility.

matic stay, was imminent. Thus, once the court order relating to the Garafalo Estate was in place, the Debtor's cash dealings must be characterized as conduct designed to defeat payment of the now-assessed Tax Debt.

Considering all of the circumstances described above, I conclude that the manner in which the Debtor handled his financial affairs constituted conduct to evade taxes within the meaning of § 523(a)(1)(C).

## 2. the Debtor's Mental State

The requisite mental state for "willfulness" under § 523(a)(1)(C), as articulated in *Fegeley,* is that a debtor's actions must be "voluntary, conscious, and intentional." 118 F.3d at 984.

Given the Debtor's knowledge of his a substantial tax liability after both: (a) the 1996 *Bealor* Decision and (2) the commencement his 2001 negotiations with the IRS that culminated in the 2002 IRS Stipulations, the issue is whether the Debtor's conduct constituted voluntary, conscious and intentional attempts by the Debtor to evade or defeat his tax liability.

 A court may infer a taxpayer's state of mind from his or her conduct. *E.g., Lacheen,* 365 B.R. at 483 ("Because a taxpayer is unlikely to admit an intentional evasion of his obligation to pay taxes, courts consider circumstantial evidence in determining willfulness."); *accord Guben,* 2008 WL 3875354, at *4. It is unnecessary to show that the taxpayer had an evil motive or sinister purpose; it is sufficient to find that the conduct was voluntary and intentional. *Scarpiello,* 240 B.R. at 210.

In *Lacheen,* the court looked at several types of circumstantial evidence in evaluating the debtor's state of mind, including:

1. the debtor's conduct over a period of time, which may extend beyond the time when the tax payment was due;

2. any manipulative conduct of the voluntary tax system by failing to make estimated payments toward anticipated tax liabilities and failing to pay taxes due when concurrently seeking the automatic filing extension;

3. failure to make voluntary payments toward tax liabilities by submitting to employer withholding tax procedures;

4. the existence of disposable income during the relevant tax years and its depletion without reservation for payment of taxes when due;

5. routine practice of applying for extensions that are automatically granted; and

6. evidence that the tax payer had the financial resources to pay but simply did not.

365 B.R. at 484–86.

 Here, the Debtor argues that he lacked the requisite intent to evade his tax obligations because, in his view, simply put, he did nothing wrong: he timely filed all tax returns and paid the reported tax thereon. Certainly, there is no question that he did that. However, there is more to this case than the Debtor's state of mind in the 1980's when he filed the returns that gave rise to the outstanding liabilities.[30]

---

**30.** The Debtor's argument regarding his intent is not limited solely to his state of mind when he filed the 1980 and 1982–88 tax returns. He also points out that, despite the criticism leveled at him by the IRS for "dealing in cash," at no time has the IRS asserted that after *Bealor* was decided has he failed to file his returns, report all of his income, or pay the reported taxes due. (*See* Debtor's Mem. at 18; 1 N.T. at 21). The Debtor makes a fair point. He is correct that there is no evidence suggesting that he attempted to evade any taxes that he incurred post-*Bealor.* This fact may lend circumstantial support to the proposition that he did not engaged in willful evasion of the previously incurred tax liabilities from the 1980's. However, the evi-

The Debtor argues that between the issuance of the *Bealor* Decision in 1996 and the actual assessment of the additional tax liabilities in April 2003, he lacked an intent to evade payment of the obligations because he did not know how much he owed. (*See* 2 N.T. at 108). His testimony on this point was as follows:

Court: [After *Bealor,*] did you have some sense of what the order of magnitude is that you were looking at? Not an exact number, but let's put it this way, even how many digits? Was it a four-digit liability, a seven-digit liability, or something in between, or more, or less?

Debtor: Well, I had an idea, but I knew that all the income that was reported was going to be reversed. And I knew that the difference was going to be the difference in tax rate from the time that the investments were made until the decision was handed down by the Court. And I knew that there was going to be an interest charge and a penalty. So, I knew that there was going to be a liability, but I didn't know the extent of what the liability was going to be.

Court: And you're saying you never gave any thought as to whether you were looking at a $50,000 liability or a five million dollar liability? . . . .

Debtor: No. *I thought that it was going to be significant.* Not what it ended up being. I had no idea that it was going to be 19 million dollars. I did think it was going to be much, much lower, but that I was going to have a liability.

\* \* \*

Debtor: I never expected it to be [$19 million].

Court: Were you expecting it to be more than a million?

Debtor No. No, I wasn't. Because I knew that all the income was going to be reversed. And the income was substantial that I had reported. . . .

(2 N.T. at 107–09) (emphasis added).

After careful consideration, I cannot credit the Debtor's testimony that after *Bealor,* he did not understand that he was facing a colossal tax liability and his suggestion that, in the five year period immediately thereafter, he had no reason or intention to manage his personal finances in a manner to evade payment to the IRS.

Putting aside the Debtor's admission that he recognized that his liability would be "significant," the rest of his testimony is too convenient and self-serving. *See In re Gardner,* 360 F.3d 551, 561 (6th Cir.2004) (citing *Lovell and Hart, Inc. v. Commissioner,* 456 F.2d 145, 148 (6th Cir.1972) (court not required to accept self-serving testimony, even if uncontradicted, if it finds the testimony improbable, unreasonable or questionable)). In the absence of some corroborating evidence that the Debtor engaged in some concrete evaluation of his tax liability exposure after *Bealor* and concluded that the liability would not be substantial, I am convinced that, despite its unliquidated status, he was aware he faced a large tax debt that he could only pay, if at all, by modifying his lifestyle and making some personal sacrifices. In reaching this conclusion regarding the Debtor's perception of the scope of his liability to the IRS, I am influenced by the fact that the Debtor is a certified public accountant who was a named partner in a firm that handled tax matters.

---

dence is not conclusive or outcome determinative on the relevant issue. I have considered the evidence, but find its probative value outweighed by the totality of the other evidence in the case.

That said, the delay in the assessment of the Tax Debt after *Bealor* lends some support to the Debtor's position. The IRS concedes that it could not invoke any of its enforcement remedies so long as the Tax Debt remained unassessed. While the Debtor does not articulate his argument in precisely this fashion, I take his position to be that he had no need to try to evade an unassessed tax that was not subject to the IRS' collection remedies, especially considering the extensive, unexplained five year delay. While this argument has some superficial appeal, for two reasons I am nonetheless convinced that he had the requisite intent.

First, § 523(a)(1) speaks of evading or defeating a "tax," not an "assessed tax." [31] The unenforceability of a tax due to the lack of assessment, by itself, does not mean that no tax exists or that a taxpayer, *per se*, cannot have an intent to evade the unassessed tax. And here, while Tax Debt was not fully liquidated or assessed between 1996 and 2001, I am satisfied, as mentioned earlier, that the Debtor was aware that it would be an enormous liability, giving him an incentive to protect himself against the day that the IRS would actively pursue collection.

Second, and more significantly, by some point in 2001, after his assessment negotiations with the IRS had begun and by June 2002, when he signed the 2002 IRS Stipulations, the Debtor unquestionably knew how much he owed. Yet, even then, he allowed the penalties and interest to continue to accrue, paid nothing toward the obligation, and filed this bankruptcy case to discharge the debt less than thirty (30) days after he could do so consistent with 11 U.S.C. § 523(a)(1)(A). [32] Meanwhile, he enjoyed many of the luxuries of life. He paid for part of the costs related to two personal residences, took at least two (2) luxury vacations each year and never maintained a checking account in his name. Moreover, the majority of his fixed living expenses were divided equally with his well-educated, employed spouse. The Debtor had the money, knew he had an obligation and just chose not to pay it.

The circumstances described above justify the inference that the Debtor's evasion was willful. *See, e.g., Fegeley*, 118 F.3d at 982–84 (upholding the finding that the Debtor "probably had enough money to pay th[e] taxes [,] … spent too much[,] … was much too lavish[, and] … didn't make good judg[ ]ments about the allocations of his resources.") (internal quotations and citation omitted); *Gardner*, 360 F.3d at 556–561 (though debtor filed tax returns, his lifestyle, which included numerous golfing trips, vacations to Europe and the Caribbean and the expenditure of

---

**31.** Elsewhere in the Code, Congress demonstrated that it was well aware of the distinction between a tax and an assessed tax. *See* 11 U.S.C. § 507(a)(8)(A)(ii) and (iii).

**32.** The bankruptcy case was filed 268 days after the IRS assessed almost all of the taxes in question. *Cf.* 11 U.S.C. § 523(a)(1)(A) (incorporating 11 U.S.C. § 507(a)(8)(A)(ii) and making nondischargeable taxes incurred within 240 days of assessment). In pointing this out, I do not suggest that every time a debtor files a bankruptcy case shortly after the expiration of the 240 day post-assessment nondischargeability period provided in the Bankruptcy Code, the debtor's conduct in the preceding time period constitutes evasion under § 523(a)(1)(C). In the context of this particular case, however, given the elaborate measures the Debtor took to avoid the potential attachment of a his cash resources and the lack of evidence suggesting that the Debtor attempted to modify his lifestyle in any way after the Tax Debt was liquidated and assessed so that he could pay something toward his obligation to the IRS, the prompt filing of the bankruptcy case colors my perception of the Debtor's earlier conduct and tends to suggest that the filing was part of a larger, considered effort to evade and defeat the taxes that are the subject of this proceeding.

$25,000.00 to maintain country club memberships suggested willful evasion); *Lacheen,* 365 B.R. at 486 ("Even where the returns are filed, the failure to pay the IRS because available income has been directed to other, often non-essential purchases is sufficient to preclude a discharge under § 523(a)(1)(C)"); *Jacobs,* 2006 WL 2691516, at *14 ("lavish spending in the face of mounting tax debt also demonstrates conduct designed to 'evade or defeat [a] tax' "); *In re Hassan,* 301 B.R. 614, 622–24 (S.D.Fla.2003) (taxpayers who enjoyed a profligate lifestyle had not proven themselves to be the poor but honest debtors for whom the fresh start is intended).

██ As the court in *In re Angel,* 1994 WL 69516, at *4 (Bankr.W.D.Okla. Feb. 24, 1994) explained:

> Debtors with an inability to pay their taxes with no more culpability will have their tax debts discharged. However, debtors who have cash in hand and, instead of responding to their tax obligations, choose to pay other creditors or purchase luxury items and expensive homes will have their debts excepted from discharge.

## V. *CONCLUSION*

The Debtor, a certified public accountant for over thirty years, earned between $80,000.00 and $200,000.00, maintained no personal bank accounts and enjoyed a relatively affluent lifestyle. He lived this life against the backdrop of a looming colossal tax obligation resulting from sham tax shelters that his accounting firm devised and promoted. Yet, for almost seven (7) years after his liability was determined, he neither earmarked nor paid *anything* toward his outstanding tax obligation. He then conveniently sought to discharge his liability in bankruptcy, virtually as soon as the opportunity presented itself. Although the IRS took no action for nearly five (5) years after the Tax Court issued the decision against the Debtor, once the IRS began the process of assessing the Tax Debt, two additional years passed during which he was fully aware of the magnitude of his liability; yet he made no effort to moderate his lifestyle, alter his system of managing his personal finances by "dealing in cash" or to pay anything the IRS. Had the Debtor apportioned some of his income for repayment during any period of time, his conduct might seem less manipulative and his intentions might appear more salutary, particularly given his professional and educational background. However, he did not.

Given all of these circumstances, I conclude that the IRS has met its burden of establishing by a preponderance of the evidence that the Debtor willfully attempted to evade or defeat his tax liability. Therefore, the debt the Debtor owes for outstanding federal income taxes for the 1980 and 1982 through 1988 tax years is excepted from discharge pursuant to 11 U.S.C. § 523(a)(1)(C).

An appropriate order will be entered.

## *ORDER*

**AND NOW,** after a two-day trial and consideration of the parties' post-trial memoranda, and for the reasons set forth in the accompanying Opinion, it is hereby **ORDERED** that the Debtor's debt for federal income taxes owed to the United States, Internal Revenue Service for the 1980 and 1982 through 1988 tax years is **DETERMINED NONDISCHARGEABLE** pursuant to 11 U.S.C. § 523(a)(1)(C).